2013 Ark. 68

**Rickey BRUNER, Sr., and Melissa Workman, Appellants**

v.

**STATE of Arkansas, Appellee.**

**No. CR 12–124.**

Supreme Court of Arkansas.

Feb. 21, 2013.

Karen R. Baker, J., filed opinion concurring in part and dissenting in part in which Hart, J., joined.

Cliff Hoofman, J., filed opinion concurring in part and dissenting in part, in which Baker and Hart, JJ., joined in dissent in part.

Joseph C. Self, Fort Smith, for appellant.

Dustin McDaniel, Att'y Gen., by: Valerie Glover Fortner, Ass't Att'y Gen., for appellee.

COURTNEY HUDSON GOODSON, Justice.

A jury in the Sebastian County Circuit Court found appellants Rickey Bruner, Sr., and Melissa Workman guilty of committing first-degree battery against their son, R.B., a violation of Arkansas Code Annotated section 5–13–201(a)(9) (Supp.2011), and a class Y felony. Ark.Code Ann. § 5–13–201(c)(2). As a consequence, the jury fixed Bruner's sentence at a term of forty years in prison, and Workman received a sentence of life imprisonment. In this joint appeal, appellants are represented by

different counsel who have filed separate briefs on their behalf. However, they urge the same three points for reversal: (1) the circuit court erred by excluding evidence of their mental condition, (2) the circuit court erred by failing to give an instruction on the lesser-included offense of third-degree battery, and (3) the circuit court erred in refusing to give a proffered jury instruction defining the phrase "manifesting extreme indifference to the value of human life." Because Workman was sentenced to life in prison, our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2). We affirm appellants' convictions and sentences.

### Factual Background

Although the sufficiency of the evidence is not challenged on appeal, a recitation of the facts is necessary to place the issues under review in context. To that end, the record reflects that on March 16, 2011, officers of the Fort Smith Police Department conducted a welfare check of R.B. at appellants' home. R.B. was born on January 12, 2011, and was two months old at that time. The officers found him sitting in a car seat wrapped in a blanket in front of a space heater, although it was warm outside. Upon inspection, the officers saw that the child was severely emaciated. His eyes, cheeks, and fontanel were sunken in, and his skin hung loosely from his body. Officer Alan O'Mara testified that it "was probably the worst child or anything like that that I have ever seen," and he described his reaction to the sight of the child as "traumatizing." Bruner told O'Mara that R.B. had been to the doctor the previous week and that the doctor had told them that R.B. was small, but healthy. The officers immediately summoned an ambulance that transported R.B. to Sparks Regional Medical Center. Soon thereafter, the infant was airlifted to Arkansas Children's Hospital in Little Rock.

Detective James Melson testified that Bruner argued with him about calling an ambulance because Bruner disagreed that the child needed medical attention. Melson took a photograph of R.B., identified as State's Exhibit 4. He stated that he took this photograph because it showed the child crying, but he said that R.B. was so weak that no noise had come from his mouth. Melson also interviewed Bruner at the police station later that day. In their conversation, Bruner stated that Workman fed R.B. between two and three ounces of formula, four or five times a day, but that he was not always present at the feedings. He advised that Workman was primarily responsible for feeding the child, bathing him, and changing his diapers. Bruner said that he did not do those things because he was afraid that he would hurt the baby. Bruner related that he had noticed the condition of R.B.'s fontanel a couple of days earlier and that he had consulted his neighbors about it. He acknowledged that his son did not look like other children he had seen, and when asked why he did not call a doctor, Bruner replied that he did not want to get into an argument with Workman.

Detective Patricia Sullivan also spoke with Bruner that afternoon. She stated that Bruner told her that his son was fine, only a little dehydrated. Bruner said that R.B. had been eating every three or four hours and that he had noticed nothing unusual about the child; that he kept most of his food down; and that he would throw up every once in a while.

Detective Melson executed a search warrant for appellants' home the next day. He found two makeshift dog pens in the home containing well-fed, healthy puppies, an older dog, and dog food. Melson said that plenty of adult food was in the house and that the refrigerator was well stocked.

He located two cans of infant formula and two partial cases of infant formula, one of which was littered with rodent droppings. Melson found a child's bottle in the bedroom, and the latex nipple appeared to have been gnawed on by mice.

John Taylor, the clinic coordinator for the Sebastian County Health Department, testified that appellants were accepted into the WIC program and approved to receive vouchers for infant formula for three months. Records showed that Workman received a voucher for formula on January 26, 2011, that she used on January 28, 2011. A second voucher was picked up on February 26, 2011, and cashed in four days later. Taylor testified that parents are educated about the nutritional needs of their child and that the health department offers guidance to parents if their child does not tolerate formula. He said there was no record of Workman contacting the office with questions about using a different kind of formula.

Glenda Simpson, an investigator with the Division of Child and Family Services, saw R.B. at the emergency room. She said that his fontanel was so large that she "could put her entire hand in his head." Simpson testified that R.B. did not respond to voice or touch and that the child had no idea how to suck the nipple of a bottle. She stated that he "looked alien due to the amount of skin that was hanging off of his body and bones protruding everywhere."

Detective Tammy Dernier also observed R.B. at the emergency room. She testified that one could see every rib and every bone in R.B.'s skull; that his skull was sunken; and that he acted as though he did not know what to do with a bottle. Dernier conducted an interview of Workman that afternoon. Workman told Dernier that R.B. had last seen the doctor the previous Monday and that she had called the doctor's office every day about his not keeping food down but that she had not received a return call. Workman stated that there was nothing wrong with her child and that she would not lie about feeding him. She said to Dernier that sometimes she would feed R.B. three ounces of formula every two to three hours but that she usually fed him every five to six hours after he woke up. Dernier testified that Workman did not ask how R.B. was doing and that she became emotional only at the prospect of going to jail.

Detective Michael McCoy also interviewed Workman on March 16, 2011. She told McCoy, "I don't feed him, not like he really wants to be fed. If he's crying, then I stick a bottle in his mouth, and if he don't start sucking, I don't give it to him." When asked how often she fed R.B., Workman responded,

Once a day. And I'm not lying about that part. Usually every day when I have the formula. Here lately, I've been only feeding him once a week because I haven't had the formula. We tried getting on food stamps, and I'm still waiting for the checks from WIC. I've only been feeding him once a week since the beginning of this month. Before that, I had WIC and I fed him twice a week. For the whole month. January, I fed him twice.

Anita DeSchryber, a registered nurse who works at the office of R.B.'s pediatrician, Dr. James Cheshier, testified that R.B. weighed seven pounds, seven ounces at birth. Dr. Cheshier examined R.B. on January 26 and February 24, 2011. On January 26, he weighed six pounds, twelve ounces, and DeSchryber testified that it was not unusual for a child to lose weight after birth. On February 24, R.B. weighed seven pounds, seven ounces. DeSchryber said that he looked good and was gaining weight but that he did have

thrush, a yeast infection of the mouth. DeSchryber testified that Dr. Cheshier prescribed medication for this condition on February 4 and that the doctor renewed the prescription at the office visit on February 24. She said that thrush is a fairly common malady that can cause a baby to have difficulty eating. DeSchryber testified that parents generally call if that situation arises and that the problem is treatable. DeSchryber also testified that the office keeps records of parents' calls and that the only record of a call from either Workman or Bruner was on February 4, when Bruner called about R.B. having thrush.

Dr. Chester Carlson treated R.B. at the emergency room. He said that the child presented as an obviously very sick, lethargic, and limp baby. He also described the child as having an "alien-like appearance" and said that he was "skin and bones" without any fat or muscle. Carlson said that R.B. was cachetic and that he was in a condition called marasmus, meaning a wasting-away syndrome. He stated that the fontanel was abnormally depressed and that it was the largest he had ever seen in a two-month-old child. Carlson said that he could see the suture lines on R.B.'s skull due to lack of fat and that the skin covering his skull was so thin that "[i]f you poke on that [fontanel] you would poke right on the child's brain." He testified he had never seen a baby this emaciated and malnourished. Carlson expressed the view that the child was not simply dehydrated, "it [was] starved." He further testified that R.B. was nearing renal failure and that his BUN scores indicated that the child had been breaking down his brown fat and muscles for sustenance. He also said that the child was hypothermic because he had cannibalized all his brown fat that provides insulation. Carlson offered the opinion that this had been going on for a while, perhaps a week

or two, and that R.B. was dying and would have died in a matter of days without medical intervention. He also testified that re-feeding a child can cause death and that re-feeding a severely malnourished child has to be done carefully and slowly with constant monitoring. Carlson said that the parents could not have restored the child to good health without medical intervention.

Dr. Karen Farst treated R.B. at Children's Hospital, where he was placed in intensive care. She testified that R.B. was cachetic; that his bones were easily visible through the skin; and that he had no fat underneath the skin, which hung loosely from his body. His anterior fontanel was larger than usual and very sunken. Farst said that his appearance suggested more than dehydration. Her examination revealed no medical condition that would have caused him to become malnourished. Farst stated that R.B. was in great danger and that he would not have survived for more than a few more days without medical intervention. She also said that he was past the point where simply feeding him would have restored him to good health. In her medical opinion, the child's malnourished condition was due to inadequate calorie intake resulting from care-giver neglect. Farst testified that R.B.'s condition was consistent with having been fed once per week for the last three weeks. She stated that R.B. was in the hospital from March 16 to March 28, 2011. Farst said that it took a week of rehydration and feeding him slowly before his body returned to a positive nutrition status where he could begin gaining weight. She testified that, in her experience, she had seen five children in as bad a condition as R.B. Of those five, three died.

Penny Jester, a child-development specialist, evaluated R.B. when he was six months old. She said that he was smaller

than expected for a child that age. Jester said that R.B. was receiving physical therapy for gross motor skills; occupational therapy for the development of fine motor skills, and speech therapy. She said that he had progressed but was still behind for a child his age.

Laura Ward, R.B.'s legal guardian and potential adoptive parent, testified that she brought him home from the hospital on March 28, 2011, and that she fed him every three hours around the clock. She said that he attended therapy sessions of some kind every day. Her impression was that the child would require years of therapy, not weeks or months.

Melissa Vanderhoof testified that she was the former caseworker assigned to appellants from Rogers County Child Welfare in Claremore, Oklahoma. She became involved with them when Workman's daughter, OB.,[1] was taken into foster care due to environmental neglect. Workman's parental rights were terminated as to this child; she did not appear at the termination hearing. C.B. had special needs, as she was afflicted with fetal-alcohol syndrome. Vanderhoof testified that the child was around eighteen months old when taken into custody and that she was not underweight or malnourished. She further testified that appellants took parenting classes and received certificates for completing the classes. Vanderhoof said that appellants fed that child in her presence on more than one occasion.

During Vanderhoof's cross-examination, Bruner introduced into evidence the records from the Oklahoma proceeding, which included psychological evaluations of Bruner and Workman. Vanderhoof recalled that Bruner functioned at a borderline level; that he read and performed arithmetic at a third-grade level; and that he spelled at a second-grade level. She noted that the records showed that he had memory issues, that he was subject to confusion, and that his abstract thinking was impaired. Vanderhoof acknowledged a report from the therapeutic foster parent dated March 30, 2009, stating,

I fully understand that Mr. Bruner and Ms. Workman want [C.B.] back and I am compassionate to that fact. However, my concern is whether they have the capacity, decision-making ability, stability, and resources to provide the physical, emotional, social, and economic needs of a child with her extensive issues and needs.

Vanderhoof stated that intellectual functioning is important to the care of a child to a certain point and that, if someone has a low intellectual level, their ability to make good decisions can be impaired.

During Workman's cross-examination, Vanderhoof testified that Workman was receiving disability and that Workman told her that it was based on her intellectual delays and bipolar disorder. Vanderhoof felt that Workman had the emotional development of a "mid-teen."

With regard to the records from the Oklahoma dependency-neglect proceeding, the report of Workman's psychological evaluation noted that her parents also received disability income due to learning disabilities and intellectual limitations. The evaluator also reported that she had completed the eighth grade and left school due to "trouble learning and poor grades" and that she participated in special-education classes. Workman had also attempted suicide at age fifteen. The report issued from Bruner's psychological evaluation disclosed that he could not name the first president of the United States and did not know the name of the

---

1. C.B. is not Bruner's biological child.

current president; he thought George Washington was the president during World War II; and he could not name the two countries bordering the United States. The report also stated that it was unlikely that he could pass the GED exam and that he would be unable to persist in gainful employment. Bruner completed the Reynolds Intellectual Screening Test, which resulted in a score of 85, placing his intellectual functioning at a below-average range.

Bruner elected to testify at trial. He said that having the new baby was a joy but that Workman had assumed primary responsibility for taking care of the child. He said that he did not provide assistance because he was afraid that he would do something wrong. Bruner stated that he allowed Workman to care for the child during the day while he was working and that he trusted her and believed that she was doing the best she could. Bruner testified that the child was bundled up most of the time with a cap on his head. He said that he first noticed that the top of R.B.'s head was sunken in a couple of days before his arrest. Bruner testified that the child's head caused him concern and that he talked to his neighbors about it. He stated that he and Workman did not have an agreement to kill the child by not feeding him. However, Bruner agreed that a person would wither and die without eating.

Based on this evidence, the jury found appellants guilty as charged. As stated, Workman was sentenced to life in prison, while Bruner was sentenced to a term of forty years' imprisonment. This appeal followed.

*Exclusion of Appellants' Psychological Evaluations*

Appellants' first argument on appeal involves an evidentiary issue. At trial, appellants sought to introduce the reports of their psychological evaluations that were conducted by Dr. Paul Deyoub. In the reports, Deyoub diagnosed both Workman and Bruner with Borderline Intellectual Functioning. He found that Workman had a full-scale IQ of 71, while Bruner had an IQ of 77. Deyoub also expressed the opinion that neither of them was mentally retarded and that they did not have a mental disease or defect. Appellants asserted that the purpose of introducing the reports was to establish evidence of their IQs. While acknowledging that they were not asserting the affirmative defense of mental disease or defect, appellants argued to the circuit court that evidence of their below-average intelligence was admissible on the issue of whether they had the capacity to form the mental state necessary for the commission of first-degree battery. The circuit court ruled that the reports were not admissible for that purpose because appellants were not asserting the defense of mental disease or defect.

On appeal, appellants argue that the circuit court erred by refusing to admit the reports during the guilt phase of trial.[2] Specifically, appellants contend that the reports should have been admitted to assist the jury in determining whether they acted "knowingly" in causing serious physical injury to the child, as required for the commission of first-degree battery under section 5–12–201(a)(9). They argue that the reports, along with other evidence, would have allowed the jury to find that their failure to recognize the child's deteri-

2. Workman introduced into evidence the report of her psychological evaluation during   the penalty phase of trial.

oration was due to their low intellectual functioning. As authority, appellants rely on Arkansas Code Annotated section 5–2–303 (Repl.2006), and *Graham v. State*, 290 Ark. 107, 717 S.W.2d 203 (1986).

The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818. The abuse-of-discretion standard "is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration." *Grant v. State*, 357 Ark. 91, 93, 161 S.W.3d 785, 786 (2004). Nor will we reverse absent a showing of prejudice. *Gulley v. State*, 2012 Ark. 368, 423 S.W.3d 569; *Davis v. State*, 350 Ark. 22, 86 S.W.3d 872 (2002).

Arkansas Code Annotated section 5–2–303, formerly Arkansas Statutes Annotated section 41–602 (Repl.1977), provides,

> Evidence that the defendant suffered from a mental disease or defect is admissible to prove whether the defendant had the kind of culpable mental state required for the commission of the charged offense.

With reference to this statute, in *Graham, supra*, we found reversible error in the circuit court's exclusion of lay testimony that Graham "goes to pieces" under pressure. *Graham*, 290 Ark. at 110, 717 S.W.2d at 204. We held that evidence of Graham's mental condition, "[e]ven if it did not show mental disease or defect sufficient to constitute a defense," was relevant on the issue of Graham's culpable mental state. *Id.* at 110, 717 S.W.2d at 204 (quoting *Campbell v. State*, 265 Ark. 77, 576 S.W.2d 938 (1979)). Noting that lay testimony, given a proper foundation, was admissible on the accused's mental and emotional condition, we held that it was prejudicial error to exclude the testimony.

Subsequently, in *Stewart v. State*, 316 Ark. 153, 870 S.W.2d 752 (1994), we adopted the position that expert testimony on the ability of a defendant to form the specific intent necessary to commit the charged offense is not admissible. In so holding, we drew a distinction between psychiatric testimony concerning whether a defendant has the ability to conform his conduct to the requirements of the law as part of an insanity defense and testimony on whether the defendant had or did not have the required specific intent to commit the crime. We said,

> A general inability to conform one's conduct to the requirements of the law due to mental defect or illness is the gauge for insanity. It is different from whether the defendant had the specific intent to kill another individual at a particular time. Whether Stewart was insane certainly is a matter for expert opinion. Whether he had the required intent to murder Ragland at that particular time was for the jury to decide.

*Stewart*, 316 Ark. at 159, 870 S.W.2d at 755. As we explained in *DeGracia v. State*, 321 Ark. 530, 532, 906 S.W.2d 278, 279 (1995),

> The basis of our holding [in *Stewart*] was that Rule 704 requires that expert opinion of the sort that "embraces an ultimate issue" must be "otherwise admissible." To be otherwise admissible the evidence, according to Ark. R. Evid. 403, must be helpful to the jury and not tend to be confusing. We said in the *Stewart* case that the testimony in question was potentially misleading and confusing to the jury.

In *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000), it was argued that *Stewart* does not preclude the admission of

expert testimony concerning a defendant's inability to conform his conduct to the requirements of the law. We concluded, however, that the proposed testimony was not relevant for that purpose because Hinkston did not assert the affirmative defense of mental disease or defect.

In the case at bar, the circuit court's ruling is consistent with our decisions in *Stewart* and *Hinkston.* Appellants did not claim the insanity defense that they lacked the capacity to conform their conduct to the requirements of the law. Yet, their stated purpose for introducing the evidence was to prove that they lacked the ability to form the specific intent necessary for the commission of first-degree battery. The admission of evidence for that purpose is expressly prohibited by *Stewart*. We thus find no abuse of discretion in the circuit court's ruling to deny appellants' request to introduce the reports.

■ Moreover, the exclusion of the reports was harmless. Through the testimony of Melissa Vanderhoof and the records admitted from the Oklahoma dependency-neglect proceeding, appellants presented ample proof of their intellectual limitations. Therefore, even if the exclusion of the reports showing a particular IQ was error, it was harmless. *Boyle v. State,* 363 Ark. 356, 214 S.W.3d 250 (2005) (holding that the exclusion of testimony was harmless where the same evidence was introduced through other witnesses); *Morgan v. State,* 333 Ark. 294, 971 S.W.2d 219 (1998) (holding that evidentiary error is harmless if the same or similar evidence was otherwise introduced); *Phillips v. State,* 293 Ark. 588, 739 S.W.2d 688 (1987) (holding that exclusion of testimony concerning the mental competency of the defendant was harmless because it was cumulative of other testimony on the same issue).

## Lesser-included Offense

■ Next, appellants claim error in the circuit court's refusal to instruct the jury on the lesser-included offense of third-degree battery. They contend that there was evidence from which the jury could have found their conduct to be reckless, the mental state required for third-degree battery.

■ This court zealously protects the right of an accused to have the jury instructed on a lesser-included offense, and it is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by even the slightest evidence. *Webb v. State,* 2012 Ark. 64, 2012 WL 503885. Once an offense is determined to be a lesser-included offense, the circuit court is obligated to instruct the jury on that offense only if there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the lesser-included offense. *Green v. State,* 2012 Ark. 19, 386 S.W.3d 413. A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Sweet v. State,* 2011 Ark. 20, 370 S.W.3d 510.

For purposes of this case, a person commits the offense of first-degree battery if he or she knowingly causes serious physical injury to a person four years of age or younger under circumstances manifesting extreme indifference to the value of human life. Ark.Code Ann. § 5–13–201(a)(9). A person acts knowingly with respect to his conduct or the attendant circumstances when he or she is aware that his conduct or the attendant circumstances exist, and he acts knowingly with respect to the result of his conduct when he or she is aware that it is practically certain that his conduct will cause the result. Ark.Code Ann. § 5–2–202(2)(A) & (B) (Repl.2006).

A person commits battery in the third degree if the person recklessly causes physical injury to another person. Ark. Code Ann. § 5–13–203(a)(2) (Repl.2006). Pursuant to section 5–2–202(3), "recklessly" is defined as,

(A) A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.

(B) The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation[.]

As indicated, first-degree battery and third-degree battery differ in terms of the requisite mental states of "knowingly" and "recklessly." However, the two offenses also differ with respect to the type of injury caused by the offender's conduct. Under section 5–13–201(a)(9), first-degree battery involves serious physical injury, which is one that "creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark.Code Ann. § 5–1–102(21) (Supp.2011). Pursuant to section 5–13–203, third-degree battery is a battery that results in physical injury, which means the impairment of physical condition; infliction of substantial pain; or the infliction of bruising, swelling, or a visible mark associated with physical trauma. Ark.Code Ann. § 5–1–102(14).

Our decision in *Sbabo v. State*, 264 Ark. 497, 572 S.W.2d 585 (1978), is instructive. There, Sbabo and Cockerel were convicted of first-degree battery for shooting a man on a golf course with a rifle. On appeal, they argued that the circuit court erred by not instructing the jury on third-degree battery. The victim in that case suffered a collapsed lung as a result of the gunshot wound. He was placed in intensive care and remained in the hospital for one week. On this evidence, we concluded that there was no rational basis for giving an instruction on the lesser-included offense of third-degree battery for recklessly causing physical injury because the evidence showed only that the victim sustained a serious physical injury involving a substantial risk of death.[3]

Here, the testimony reveals that R.B. was severely malnourished to the point of starvation and that death would have occurred within days had he not received medical attention. R.B. remained in the hospital for twelve days, and he has required extensive therapy following his discharge from the hospital. The testimony also indicates that the effects he suffered from starvation will remain with him for years to come. Regardless of whether there was some evidence of reckless conduct, the physical injury sustained by R.B. can only be classified as serious.[4] In keeping with our decision in *Sbabo*, the circuit court did not abuse its discretion by refus-

3. In the opinion, we referenced the provisions of Ark. Stat. Ann. § 41–1603(a)–(c) (Repl. 1977). Section 41–1603(b) is identical to the current section 5–13–203(a)(2).

4. The statement in Justice Baker's dissent that "the child needed only to be fed to be brought back to health" is grossly inaccurate. The testimony established that simply feeding the child would not have restored him to good health. On the contrary, re-feeding him could have proved lethal if done without medical intervention and close supervision. This attempt to minimize the child's condition as involving anything less than serious physical injury is wholly unsupported by the record.

ing to instruct the jury on third-degree battery.[5]

*Extreme-indifference Instruction*

■ As their final point on appeal, appellants contend that the circuit court erred by refusing to give their proffered instruction defining the phrase "manifesting extreme ⌊₁₈indifference to the value of human life" with the instruction on first-degree battery. Citing *Price v. State*, 373 Ark. 435, 284 S.W.3d 462 (2008), and *Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000), appellants proposed an instruction defining the phrase to mean "that the actions of the accused were such that they created as least some risk of death which evidenced a mental state on the part of the accused to engage in some life threatening activity against the victim." Although the model instruction does not contain a definition of this phrase, appellants assert that the instruction should have included this definition because it is an accurate statement of the law.

■ Nonmodel instructions are to be given only when the trial court finds that the model instructions do not accurately state the law or do not contain a necessary instruction. *Sipe v. State*, 2012 Ark. App. 261, 404 S.W.3d 164. A circuit court is not required to give an instruction just because it is an accurate statement of

the law. *Love v. State*, 281 Ark. 379, 664 S.W.2d 457 (1984). Moreover, a court is not required to instruct in every possible manner. *Lipscomb v. State*, 271 Ark. 337, 609 S.W.2d 15 (1980). Here, the circuit court instructed the jury in accordance with AMI Crim.2d 1301. In this instruction, the requisite mental state is clearly established by instructing the jury that guilt of first-degree battery requires proof that appellants acted knowingly. The model instruction defines the term "knowingly" as a state of mind in which a person is aware that it is practically certain that his conduct will cause such a result. The model instruction also includes a definition of serious physical injury as creating a substantial risk of death. Thus, the model instruction adequately conveyed the concept that is virtually identical to the nonmodel definition preferred by appellants. Because the model⌊₁₉instruction accurately states the law and includes all necessary elements, the circuit court did not abuse its discretion by declining appellants' proffered instruction.

*Compliance with Rule 4–3(i)*

In this case, Workman received a sentence of life in prison. Pursuant to Arkansas Supreme Court Rule 4–3(i), the record has been reviewed for all objections, motions, and requests that were decided ad-

---

**5.** The dissenting opinion authored by Justice Hoofman appears to rely on our holding in *Sbabo* that Cockerel was entitled to an instruction on the lesser-included offense of second-degree battery because there was evidence of reckless intent. However, his reliance on that holding is misplaced. The dissent ignores that the relevant provision of the second-degree battery statute provided that a person committed that offense if "he recklessly causes *serious physical injury* by means of a deadly weapon." Ark. Stat. Ann. 41–1602(d) (Repl.1977). Because there was evidence of both reckless conduct *and* serious physical injury, we concluded that a second-

degree battery instruction was appropriate. On the other hand, the *Sbabo* court plainly held that a third-degree battery instruction, which includes the element of physical injury, was not warranted because serious physical injury resulted, even though there was some evidence of reckless intent. That holding is controlling here, where the conduct caused serious physical injury and not mere physical injury. Based on principles of stare decisis, we are bound to follow prior case law. *Hervey v. State*, 2011 Ark. 113, 2011 WL 913203; *Anderson v. State*, 367 Ark. 536, 242 S.W.3d 229 (2006).

versely to Workman, and no prejudicial error was found.

Affirmed.

BAKER, HART, and HOOFMAN, JJ., concur in part and dissent in part.

KAREN R. BAKER, concurring in part and dissenting in part.

While I agree that the trial court abused its discretion in refusing to instruct the jury on the lesser-included offense of third-degree battery and join Justice Hoofman's dissent on this point, I write separately because I cannot say that there is not the "slightest evidence" from which the jury could have concluded that the baby suffered only "physical injury" as opposed to "serious physical injury." As the majority points out, a serious physical injury is one that "creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark.Code Ann. § 5–1–102(21) (Supp.2011). The majority asserts that death would have occurred within days had the child not received medical attention. There was certainly evidence to support this conclusion, but two days without hydration would create a substantial risk of death for anyone. There is also evidence that the child needed only to be fed to be brought back to health. While there is substantial evidence that the child suffered a serious physical injury, I cannot say that there is *not the slightest evidence* that the child suffered a physical injury under our law. It is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by even the slightest evidence. *Jones v. State*, 2012 Ark. 38, 388 S.W.3d 411.

Additionally, I believe the circuit court erred in excluding appellants' mental examination from evidence. Appellants' mental examination was relevant evidence that the circuit court should have allowed. Appellants sought to introduce the mental examination to help the jury determine whether appellants acted knowingly or recklessly and to explain Workman's inconsistent statements. The evidence was not offered to show whether appellants had the ability to form the specific intent necessary to commit first-degree battery, as in *Stewart v. State*, 316 Ark. 153, 870 S.W.2d 752 (1994), and in *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000). Instead, the evidence was offered to help the jury determine whether appellants had formed the specific intent necessary in this instance. Because such evidence is not excluded under our prior precedents, it was admissible relevant evidence under Arkansas Rule of Evidence 402. Ark. R. Evid. 402 (2012).

The majority also holds that the exclusion of the mental examination was harmless error, as "appellants presented ample proof of their intellectual limitations." However, the proof presented, testimony from Melissa Vanderhoof and the records admitted from the Oklahoma dependency-neglect proceeding, are not the same as a mental evaluation outlining appellants' specific intellectual quotient and mental abilities performed by a forensic psychologist.

I would reverse the circuit court's ruling rejecting the appellants' proffered jury instruction on the lesser-included offense of third-degree battery. Further, I would reverse and remand on appellants' first point on appeal, because it is an issue likely to recur on retrial. I would affirm as to appellants' third point on appeal.[1]

HART, J., joins.

1. While the majority's footnote 4 is correct

that the testimony demonstrated that the child

CLIFF HOOFMAN, Justice, concurring in part and dissenting in part.

I concur in the majority's holdings on appellants' first and third points on appeal, but I respectfully dissent on the second point on appeal. I would reverse the circuit court's ruling rejecting appellants' proffered jury instruction on the lesser-included offense of third-degree battery.

As the majority states, it is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by even the *slightest* evidence. *Webb v. State*, 2012 Ark. 64, 2012 WL 503885. Appellants argue that there was ample evidence in this case from which the jury could have found their conduct toward their son to be reckless, rather than knowing, and I agree. Arkansas Code Annotated section 5–13–201(a)(9) (Supp.2011), which sets out the elements of first-degree battery, requires that the defendant "knowingly" cause serious physical injury, while the third-degree-battery statute requires only that the defendant act "recklessly." Ark.Code Ann. § 5–13–203(a)(2) (Repl.2006). A person acts "recklessly" with respect to attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial or unjustifiable risk that the attendant circumstances exist or the result will occur. Ark.Code Ann. § 5–2–202(3) (Repl.2006).

According to the uncontradicted evidence presented at trial with regard to Bruner, Workman was responsible for feeding, bathing, and caring for R.B. Bruner stated that he trusted Workman to properly care for their son, that he understood that she was feeding him every three to four hours, and that he also saw her feeding the baby. Bruner testified that R.B. was bundled up most of the time with a cap on his head and that it was not until two days before the police showed up that he noticed his son's sunken fontanel. At that point, he stated that he became worried and spoke to neighbors about his concerns. Bruner testified that he did not want any harm to come to his son and that he and Workman did not decide to quit feeding R.B.

In Workman's statements to police that were played at trial, she initially insisted that she fed R.B. three ounces of formula every two to three hours, then admitted that she fed him every five to six hours because she did not wake him up to eat. After repeated questioning by two different detectives, Workman changed her story several times, stating that she fed her son once per day, once per week, or twice per week, depending on if she had the money for formula. While she admitted that she did not feed her son "like he really wants to be fed," at no time did Workman indicate that she intended to hurt him.

There was also evidence presented that both appellants suffered from below-average intellectual functioning, that Bruner functioned at a borderline level and had memory and confusion issues, and that Workman was receiving disability for intellectual delays and bipolar disorder. Their former caseworker, Melissa Vanderhoof, testified that intellectual functioning is important to the care of a child and that someone with low intellectual functioning has an impaired ability to make good decisions. Further, there was evidence that

required medical intervention and close supervision, the record also shows that the medical intervention and close supervision consisted of nothing more than feeding the child. While overwhelming evidence may exist that

the injury suffered by the child was a serious physical injury, there is still the "slightest evidence" that the injury suffered was only a physical injury.

R.B. had been to the pediatrician on two occasions, that he had gained weight between his first and second visits, that there were no concerns noted by the doctor at the child's last visit only three weeks prior to appellants' arrest, and that R.B. had been twice prescribed medication for thrush, which can make it painful for a child to eat.

The evidence recited above clearly amounts to more than slight evidence from which the jury, which is responsible for determining the weight and credibility to be given to the evidence, could find that appellants acted recklessly, rather than knowingly, toward their son. While the majority cites *Sbabo v. State*, 264 Ark. 497, 572 S.W.2d 585 (1978), the issue in that case was whether the defendants were entitled to lesser-included instructions on second- or third-degree battery, and this court held that there was evidence to support the second-degree battery instruction as to one defendant because there was evidence of reckless intent. Here, there was no proffered instruction on second-degree battery, and the only issue is whether appellants were entitled to an instruction on third-degree battery. Because the injuries to R.B. met the definition of "serious physical injury," the majority contends that there was no rational basis for a verdict acquitting appellants of first-degree battery and convicting them of third-degree battery, even if there was evidence of reckless intent presented here. I cannot agree with the majority's decision on this point, as this holding completely ignores that there are *two* elements contained in the first-degree-battery statute. *See Tigue v. State*, 319 Ark. 147, 889 S.W.2d 760 (1994) (stating that although the victim clearly suffered serious physical injury, that is only one of the facets of proof required to sustain a conviction under

the first-degree-battery statute). While the injuries to R.B. could be classified as serious physical injury, there was also ample evidence from which the jury could have found reckless intent on the part of appellants, and under these facts, I find that the circuit court abused its discretion in refusing to instruct the jury on third-degree battery.

BAKER and HART, JJ., join in the dissent in part.