Cite as 2019 Ark. 245

# SUPREME COURT OF ARKANSAS

**No.** CR–18–816

| | | |
|---|---|---|
| | | **Opinion Delivered:** September 19, 2019 |
| DERRICK A. DIXON | | |
| | APPELLANT | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70CR-15-338-1] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE HAMILTON H. SINGLETON, JUDGE |
| | APPELLEE | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Derrick Dixon appeals his convictions in the Union County Circuit Court of murder in the first degree and battery in the first degree.[1] Dixon received a life sentence for his murder conviction and forty years each on the battery and possession-of-a-firearm convictions. Because the jury found that Dixon used a firearm in the murder and the battery, he received an additional fifteen years on each of those convictions. The circuit court imposed all sentences consecutively. For reversal, Dixon argues that the circuit court erred when it denied his request to instruct the jury as to the lesser-included offenses of murder in the second degree, extreme-emotional-distress manslaughter, and battery in the second degree. We affirm.

---

[1]Dixon was also charged with, and convicted of, possession of a firearm by certain persons, but he does not appeal that conviction.

## I. *Background*

Dixon was charged by amended information with murder in the first degree in violation of Arkansas Code Annotated section 5-10-102 (Repl. 2013) for the September 2, 2015 shooting of Cordario Floyd and battery in the first degree in violation of Arkansas Code Annotated section 5-13-201 for the shooting of Ja Terrance Hamilton on the same day. The State sought enhanced penalties under Arkansas Code Annotated section 16-90-120 (Repl. 2016) on both counts due to Dixon's use of a firearm. The State also sought enhanced penalties on both counts pursuant to Arkansas Code Annotated section 5-4-501 based on Dixon's prior felonies.

The jury trial was held on February 27–28, 2018. At trial, Hamilton testified that he was a passenger in a car that Cordario Floyd was driving down Brewster Street in El Dorado when Antonio Critton flagged them down in front of a residence. Floyd got out of the vehicle while Hamilton remained inside. Hamilton testified that Floyd went to the porch and was talking with Critton. Preston Stanley and Dixon were also on the porch. According to Hamilton, while Floyd and Critton were talking, Dixon left the porch and went to the side of the house. Hamilton testified that when Dixon returned, he shot Floyd. Hamilton said that Dixon was at about arm's length from Floyd when he fired the shot.

According to Hamilton, Dixon then left the porch and shot him in the neck while he was sitting in the vehicle. Hamilton testified that he then fled, and Dixon shot him a second time in the back-shoulder area. Hamilton fell in a neighboring yard, injuring his knee in the process. Eventually Hamilton had surgery on his knee and for the shoulder

2

wound. No surgery was required for Hamilton's neck wound because the bullet passed through his neck.

Critton testified that he and Dixon were on the porch when Floyd arrived, and he and Floyd began "talking and laughing." At some point, according to Critton, Dixon left the porch. Stanley remained on the porch. Critton described hearing footsteps as someone returned from the area where Dixon had been earlier. Critton turned to see who it was and saw a muzzle flash. Critton heard several shots and fled.

Latoya Smith, Dixon's then girlfriend, also testified. Smith was not at the residence when the shooting occurred, but her involvement began when Dixon called her and asked her to come get him in an area near his mother's residence. Smith testified that when she arrived in the area, Dixon "came out of nowhere" and got into the car with her. According to Smith, Dixon directed her to take him to his father's house, but no one answered the door. Dixon returned to the vehicle and ordered her to drive to another area. Dixon also discussed needing more bullets. Smith testified that, after a period of time, Dixon began beating on the dashboard and said, "[T]hey got me f'd up and I don't bother nobody and they were messing with me and I go and kill somebody they mess with me." Dixon also mentioned shooting another person. Smith eventually left Dixon at another individual's home and drove to the crime scene where she reported Dixon's whereabouts.

Adam Craig, the state medical examiner, testified that Floyd died as a result of a gunshot wound to his head. According to Craig, there was no stippling around the wound. Craig explained that stippling is small red or brown spots around a wound that result from skin abrasions caused by gunpowder coming out of the barrel of the gun. The lack of

3

stippling indicates that the fatal shot was fired from some distance. Craig concluded that the gun was fired from more than three feet away.

At trial, the circuit court considered Dixon's arguments in favor of his proffered instructions for lesser-included offenses. Ultimately, the jury was instructed only on murder in the first degree for Floyd's shooting and battery in the first degree for Hamilton's shooting. The circuit court denied Dixon's request to instruct the jury on murder in the second degree, manslaughter, and battery in the second degree. A jury convicted Dixon on all counts, and Dixon was sentenced as set forth previously. Dixon filed a timely appeal.

## II. *Standard of Review*

A circuit court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Bruner v. State*, 2013 Ark. 68, 426 S.W.3d 386. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Collins v. State*, 2019 Ark. 110, 571 S.W.3d 479.

## III. *Analysis*

The refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence. *Friar v. State*, 2016 Ark. 245. However, we will affirm the circuit court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Id*. Dixon argues that the circuit court erred with respect to both his murder charge and his battery charge.

4

A. Second-Degree Murder Instruction

The circuit court instructed the jury on only first-degree murder for Floyd's shooting. A person commits murder in the first degree if, "with a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2). "A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1). Dixon proffered a second-degree murder instruction pursuant to Arkansas Code Annotated § 5-10-103(a)(1), which provides that a person commits murder in the second degree if "the person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life." A person acts knowingly with respect to "a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(B).

Dixon argues that Smith's testimony that Dixon was agitated when he was in her car and that he said "they got me f'd up and I don't bother nobody and they were messing with me" provides some evidence that there was an argument on the porch that escalated into physical violence. Dixon also notes that Floyd had a firearm on his person and that a digital scale was found at the scene. However, no eyewitness described any argument or altercation. Rather, the testimony was that Floyd and Critton were "talking and laughing" before Dixon shot Floyd. Likewise, no evidence was introduced to indicate that Floyd ever brandished his firearm or that the digital scales factored into any disagreement. Eyewitness testimony consistently described a scene where Dixon shot Floyd in the head at close range and in the

5

absence of any provocation. The circuit court did not abuse its discretion by refusing to give Dixon's proffered second-degree-murder instruction because there was no rational basis for doing so.

## B. Manslaughter Instruction

Dixon also proffered an instruction for manslaughter pursuant to Arkansas Code Annotated § 5-10-104(a)(1)(A), which provides that a person commits manslaughter if "the person causes the death of another person under circumstances that would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse." Dixon argues that his statements to Smith, along with his beating on the dashboard of her vehicle, provide evidence that he was under the influence of extreme emotional disturbance for which there was reasonable excuse. However, there is no dispute that Dixon's interaction with Smith was after the murder was committed. Thus, Dixon's statements do not provide any evidence as to his mental state when he shot Floyd or establish any rational basis for giving a manslaughter instruction. Therefore, the decision to not give the extreme-emotional-disturbance manslaughter instruction does not amount to an abuse of discretion.

## C. Second-Degree-Battery Instruction

Dixon was charged with first-degree battery for his shooting of Hamilton. Dixon argues that the circuit court erred when it refused to instruct the jury as to second-degree battery. A person commits battery in the first degree if, "with the purpose of causing serious physical injury to another person, the person causes serious physical injury to any person by means of a deadly weapon." Ark. Code Ann. § 5-13-201(a)(1). Dixon acknowledges

Hamilton's testimony that Dixon shot him once in the neck and a second time in the back. However, Dixon argues that Hamilton left the hospital after three days and that the "testimony regarding the bullet injury sustained by Hamilton did not amount to serious physical injury." Thus, according to Dixon, a second-degree-battery instruction was warranted because "Hamilton was not seriously physically injured by the bullet wounds but was only physically injured."

Dixon references Arkansas Code Annotated § 5-13-202(a)(1)–(3), which in relevant part provides that:

(a) A person commits battery in the second degree if:

(1) With the purpose of causing physical injury to another person, the person causes serious physical injury to another person;

(2) With the purpose of causing physical injury to another person, the person causes physical injury to another person by means of a deadly weapon other than a firearm;

(3) The person recklessly causes serious physical injury to another person:

(A) By means of a deadly weapon.

Although Dixon references multiple provisions of section 5-13-202, he proffered an instruction based only on subdivision (a)(1). Therefore, we may consider only that proffered instruction on appeal. *See Rounsaville v. State*, 372 Ark. 252, 273 S.W.3d 486 (2008) (holding that arguments not made at trial will not be addressed for the first time on appeal). A person commits battery in the second degree if, "with the purpose of causing physical injury to another person, the person causes serious physical injury to another person." Ark. Code Ann. § 5-13-202(a)(1). Dixon provided no rational basis for giving a second-degree-battery instruction. First, we reject Dixon's argument that Hamilton's two bullet wounds do not

constitute a serious injury. "Physical injury" means the impairment of physical condition, infliction of substantial pain, or infliction of bruising, swelling, or a visible mark associated with physical trauma. Ark. Code Ann. § 5-1-102(14). A "serious physical injury" is a "physical injury that creates a substantial risk of death or that causes protracted disfigurement, protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ." Ark. Code Ann. § 5-1-102(21). The two gunshot wounds Hamilton sustained certainly created a substantial risk of death. Hamilton was hospitalized for three days and required surgery for his back wound. Hamilton testified that the bullet that struck him in the back is still lodged in his body and that he continues to have occasional pain. Furthermore, Hamilton also required surgery for the knee injury he sustained as he ran from Dixon.

Additionally, Dixon's contention that Hamilton's injury was actually not serious does not provide a basis for an instruction to the jury on second-degree battery, as both first- and second-degree battery require the infliction of serious physical injury. The only difference between the two is the intent required. First-degree battery requires the intent to inflict "serious physical injury" to another person, while second-degree battery requires an intention to inflict only "physical injury." The required seriousness of the injury actually inflicted is the same in either case. The evidence introduced at trial demonstrated that Dixon shot Hamilton once in the neck and a second time in the back as Hamilton fled. The circuit court's determination that these actions demonstrated an intent to inflict serious physical injury as opposed to merely physical injury and that the jury should receive only an instruction on battery in the first degree was not an abuse of discretion.

IV. *Rule 4-3(i) Review*

Because Dixon received a sentence of life imprisonment, the record has been reviewed for all errors prejudicial to him, as required by Arkansas Supreme Court Rule 4-3(i). No reversible error was found.

Affirmed.

HART, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** Derrick Dixon engaged in a shooting rampage. This fact alone constitutes some evidence of "extreme emotional disturbance." That evidence is enough to require the circuit court to give the manslaughter instruction that Mr. Dixon proffered. The nature of the crime also provided a rational basis for giving a second-degree-murder instruction.

As the majority correctly notes, the refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the *slightest* evidence. *Friar v. State*, 2016 Ark. 245. That is the lowest burden of production required by the law. On appeal, the reviewing court must scan the record to ensure that there was no rational basis for giving an instruction on a lesser-included offense. *Id.* The circuit court abused its discretion by refusing to give the jury proffered instructions on extreme-emotional-disturbance manslaughter and second-degree murder.

I. *Extreme-Emotional-Disturbance Manslaughter.*

Under Arkansas Code Annotated section 5-10-104(a)(1)(A), a person commits manslaughter if "the person causes the death of another person under circumstances that

would be murder, except that he or she causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse."

In addition to the fact that Mr. Dixon engaged in a shooting rampage, there was testimony from his then girlfriend, Latoya Smith, who picked him up shortly after he engaged in his shooting rampage. She testified that

> [Dixon] came out of nowhere. He got in like nothing happened. He didn't start talking about anything at first. At some point the conversation changed.
>
> . . . .
>
> His mom called my phone and asked if I had seen him. I told her yes that he was in the car with me on the passenger side. She told me not to tell him I was talking to her. She told me that if he was with me I need to take him to Magnolia Police Department because he done took someone's life. I was shocked. That is when I got scared.
>
> . . . .
>
> Probably ten minutes later we were riding and talking and that is when he started talking and things started coming out. He started talking out of his head.
>
> . . . .
>
> He pulled out a gun. He said that people got him messed up and he killed somebody.
>
> . . . .
>
> He told me he wanted me to take him over to his dad's house. I took him to his dad's house because I was scared. He had a gun, so I did whatever he told me to do.
>
> . . . .
>
> He told me that he shot a nigger in the face. And that they don't play around with him because he was going to kill some more. He told me to take him to his dad's house because he was looking for some bullets.

10

. . . .

I went over there. He told me not to leave, do not go anywhere. He got out of the car and he went and knocked on the door and no one came to the door. I got out of the car. I was like come on let's go, I'm scared. He was like, you ain't going nowhere, you're going to do what I tell you to do.

. . . .

I was scared. . . . He told me to take him on to Roosevelt and I took him to Roosevelt Street. He didn't get out on Roosevelt Street. I guess he didn't see what he was looking for.

*He was still talking about needing some more bullets. And that is when he started talking out of his head. He got to hitting my dashboard and stuff, "they got me f'd up and I don't bother nobody and they were messing with me and I go and kill somebody they mess with me" and all this stuff.*

. . . .

He didn't give any names. He told me to take him by Dooley's. I think Dooley's real name is Anthony Hicks. He lives over by the water tower across from the old ballfield.

. . . .

By the time I took him over there he was not still talking about killing people. I parked on the side of the road because like I said I was still in shock. He told me don't move, don't leave this car and he got out of the car and he went and knocked on the door. I took off because I didn't want no part of it.

. . . .

I was scared. He told me more than one time that he killed somebody, he shot somebody in the face. I started talking to him and he started talking back that he killed someone. *He said something about shooting a second person because they were messing with him.*

(Emphasis added.) In my view, Mr. Dixon's statements about his motivation for the shooting rampage and his demeanor shortly after the shooting rampage provide some evidence of extreme emotional disturbance.

11

The majority improperly analyzes this issue. It rejects Dixon's argument that his statements to Smith, along with his beating on the dashboard of her vehicle, provide evidence that he was under the influence of extreme emotional disturbance for which there was reasonable excuse, because "there is no dispute that Dixon's interaction with Smith was after the murder was committed," so "Dixon's statements do not provide any evidence as to his mental state when he shot Floyd or establish any rational basis for giving a manslaughter instruction." The majority is confusing the *weight* of the evidence with the issue of whether there *is* any evidence. If an accused's statements after he or she has committed a crime were not evidence, no conviction that is based on a confession could ever be sustained. If the majority were to consistently apply this rationale, we could fairly well empty our prisons.

## II. *Second-Degree Murder*

Under Arkansas Code Annotated section 5-10-103(a)(1), a person commits murder in the second degree if "the person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life." A person acts knowingly with respect to "a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(B).

The nature of the fatal wound—the victim was shot in the face—plus the fact that Ms. Smith testified that Mr. Dixon unhesitatingly told her that he had shot someone in the face and wanted to do more killing was some evidence of a knowing mens rea and extreme indifference to human life. The majority's rejection of this evidence because (1) "no

12

eyewitness described any argument or altercation"; (2) there was other testimony "that Floyd and Critton were 'talking and laughing' before Dixon shot Floyd"; (4) "no evidence was introduced to indicate that Floyd ever brandished his firearm or that the digital scales factored into any disagreement"; and (5)"eyewitness testimony consistently described a scene where Dixon shot Floyd in the head at close range and in the absence of any provocation" demonstrates that the majority does not understand its role on review. Ms. Smith's testimony may be evidence that is inconsistent with other evidence introduced at trial, but it is evidence nonetheless. It is always the jury's role to decide which evidence is credible and worthy of belief—not the circuit court or the reviewing court. Accordingly, it was reversible error for the circuit court to take this question away from the jury.

Our state and federal constitutions guarantee an accused the right to have the degree of his or her criminal responsibility determined by a jury. In my view, it is the role of this court to safeguard constitutional rights, not excuse their deprivation. I would reverse and remand this case for a new trial.

*Hancock Law Firm*, by: *Charles D. Hancock*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Chris R. Warthen*, Ass't Att'y Gen., for appellee.