
SLIP OPINION

# SUPREME COURT OF ARKANSAS

**No.** CR–15–825

| | | |
|---|---|---|
| ROBERT FRIAR | | **Opinion Delivered:** June 9, 2016 |
| | APPELLANT | |
| V. | | APPEAL FROM THE JACKSON COUNTY CIRCUIT COURT [NO. CR-2013-75] |
| STATE OF ARKANSAS | | |
| | APPELLEE | |
| | | HONORABLE HAROLD S. ERWIN, JUDGE |
| | | <u>AFFIRMED</u>. |

**COURTNEY HUDSON GOODSON, Associate Justice**

Appellant Robert Friar appeals the sentencing order entered by the Jackson County Circuit Court convicting him of capital murder, two counts of attempted capital murder, and seven counts of committing a terroristic act. For these crimes, the circuit court sentenced Friar to life in prison without parole for capital murder[1] and, as an habitual offender, to consecutive terms of imprisonment totaling 165 years for the remaining offenses. For reversal, Friar contends that the circuit court erred by denying his motion to suppress, in granting the State's motion in limine, and by declining his request to provide the jury with instructions on lesser-included offenses. We affirm on all issues.[2]

---

[1] The State did not seek the death penalty.

[2] We heard oral argument in this case in Batesville as part of our "appeals on wheels" program. This court was honored by the presence of Attorney General Leslie Rutledge, who ably presented argument on behalf of the State in her hometown. Friar was well represented by Janice Vaughan, a four-time veteran of the travelling program. The court expresses its appreciation to them both for their participation and the professionalism they

SLIP OPINION

I. *Factual Background*

Our review of the record reveals that Delana Aguirre and her children lived in a duplex in the Crossroads area of Newport, Arkansas, with her sister and her mother, Leslie Curl. During the early morning hours of February 27, 2013, Friar fired seven shots from outside the home through the window of Aguirre's bedroom where she had retired for the evening with two of her children. Aguirre survived three gunshot wounds—one to her back, one to her buttocks, and another to her arm. Unfortunately, Aguirre's twenty-month-old daughter, Tacquari, perished after being struck by a single bullet. Aguirre's other child was unharmed.

According to the testimony, Friar and Aguirre had been dating for seven months, and the relationship had become volatile. Aguirre testified that Friar had physically abused her, saying that he had choked her, had struck her with a closed fist, and once had hit her with a belt buckle. She also testified that Friar had threatened her life and the lives of her children and her mother. On the evening of the shooting, Friar sent Aguirre an ominous text message saying, "YEA I WILL HAVE THE LAST SAY SO U N UR MOM TELL D KIDS U LOVE THEM." At 2:32 a.m., mere seconds before the shots rang out, Friar placed a cellular phone call to Aguirre, wherein he said something that she could not understand, and then disconnected the call. Aguirre testified that she was sitting on her bed

---

displayed to the court and to each other. Their exemplary arguments set a fine example for the school children and members of the community who were in attendance.

SLIP OPINION

smoking a cigarette when Friar called and that the light from her phone was shining in the direction of the window.

The testimony also established that Friar was in close proximity to Aguirre's home at the time of the shooting. Friar lived with his mother near Garfield Street, which was at least a couple of miles from Aguirre's residence. However, that morning he had been riding in a vehicle with Bobbie Woodruff, who parked beside her aunt's house, which was near Aguirre's duplex. Bobbie testified that Friar got out of the vehicle to relieve himself; that he did not return to the vehicle; and that she picked him up a short while later around the corner from where she had parked. The evidence showed that Friar and Woodruff exchanged text messages and phone calls within minutes of the shooting and before they reconnected.

Officers arrested Friar that morning at 4:12 a.m. on Garfield Street and transported him to the Jackson County Sheriff's Office. During the booking process, officers seized Friar's clothing and his cell phone. At that time, Friar was heard to say, "Baby mama drama. It is what it is." That morning, agents of the Arkansas State Police attempted to question Friar, but Friar refused to speak with them. However, later that morning, Friar gave a statement to an officer with the Newport Police Department, and the agents from the state police subsequently interviewed Friar twice that same day. In his three statements, Friar denied that he had been involved in the shooting.

## II. *Motion to Suppress*

As his first point on appeal, Friar argues that the circuit court erred by denying his motion to suppress. His argument is multifaceted. Friar contends that there was no probable

SLIP OPINION

cause for his warrantless arrest, which requires the suppression of his statements and of the evidence collected from his clothing and his cell phone.[3] In addition, Friar argues that the circuit court should have suppressed his statements because the police failed to honor his requests for an attorney and to remain silent. He also asserts that his statements were not voluntarily given but were instead the product of coercion, intimidation, deception, and ignorance.

## A. Probable Cause

We first address the issue of probable cause for the arrest. The record of the suppression hearing reflects that Officer Chris McClellan of the Newport Police Department was the first officer to respond to the scene and that his superior, Lieutenant Allen Edwards, arrived moments later. When Edwards entered the residence, he instructed McClellan to secure the area outside the home. Edwards said that Curl was hysterical and that Aguirre was conscious and sitting in a pool of blood on the floor in the hallway. Edwards testified that he immediately began to clear the house to make sure that the perpetrator was not still present. With that purpose in mind, he asked Curl who shot Aguirre and the child. Curl replied that it was "Junior," whom she identified as Friar. Edwards said that Curl also informed him that Friar had sent Aguirre a text message that night telling her and Aguirre to "kiss their babies" and that Friar had called Aguirre moments before the shots were fired. He testified that Curl also mentioned that Aguirre and Friar had recently broken off their relationship. Edwards explained,

---

[3] A small amount of gunshot residue was found on Friar's clothing.

I asked who did this. They told me. At that point I wasn't interrogating them trying to gather every detail that would – like our investigators would be doing. I was trying to make the scene safe. Provide aid. They said he did it. I relayed that information along to the other officers and – you know, I told Patrolman McClellan later on, you know, get one of the deputies. Go to the lower end of town. See if you can locate Robert Friar and take him into custody.

Edwards further testified that he had known Friar since childhood. He said that sometimes large crowds gathered at the lower end of town and that Friar was often combative with the police on those occasions. Edwards described Friar as an "instigator" and said that Friar was the main focus of attention when dispersing the crowd. Edwards recalled a previous incident in which Friar had been accused of shooting a firearm at another person. For reasons of safety, Edwards had made other officers aware of Friar's aggressive behavior.

In his testimony, McClellan stated that Edwards sent him to provide security at the hospital where the victims had been taken. He said that he spoke with Aguirre, who told him that Friar had shot her and that Friar had purchased a gun from Bobbie Woodruff. McClellan stated that Aguirre implied that Friar was her ex-boyfriend. When McClellan was dispatched to take Friar into custody, he located Friar walking down Garland Street.

Detective Chuck Benish also testified at the hearing. When he arrived at the duplex, Aguirre and Tacquari had been taken to the hospital. Benish said that Edwards advised him that the shooter had been outside the residence because shell casings were located near the window that was riddled with bullet holes. Benish drove to the hospital and spoke with Aguirre. She told him that Friar had shot her and that she had received a phone call from Friar just prior to the shooting. Aguirre also informed Benish that Friar had sent a text



message to her that night saying that "[Aguirre] and her mother better tell their kids they loved them." Benish recalled that Aguirre told him that Friar had asked her which bedroom she was sleeping in that night and that she had informed Friar that she was sleeping in her children's bedroom, as she did not have one of her own. Benish testified that Aguirre never told him that she saw the shooter and that Aguirre informed him that she had not seen Friar in two days.

For reversal, Friar argues that the officers neither individually nor collectively had probable cause to arrest him. He contends that the evidence amounts only to a strong suspicion based on an ambiguous text message and a phone call immediately prior to the shooting. Friar points out that no one claimed to have seen the shooter and that the police located him after the shooting on the other side of town. Friar asserts that the statement he made during booking, the other statements he gave to the police, his clothing, and the information contained on his cell phone must be suppressed as the fruits of the unlawful arrest.

In reviewing the denial of a motion to suppress evidence, this court conducts a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court. *MacKintrush v. State*, 2016 Ark. 14, 479 S.W.3d 14. A finding is clearly erroneous, even if there is evidence to support it, when the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Johnson v. State*, 2015 Ark. 387, 472 S.W.3d 486.

SLIP OPINION

This court has held many times that probable cause to arrest without a warrant exists when the facts and circumstances within the collective knowledge of the officers and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been committed by the person to be arrested. *Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993). Such probable cause does not require that degree of proof sufficient to sustain a conviction; however, a mere suspicion or even "a strong reason to suspect" will not suffice. *Id.* at 147, 865 S.W.2d at 277. The assessment of probable cause is based on factual and practical considerations of prudent men, rather than the discernment of legal technicians. *Roderick v. State*, 288 Ark. 360, 705 S.W.2d 433 (1986). It is based on the officers' knowledge at the moment of the arrest. *See Friend, supra.* The determination of probable cause is also measured by the facts of each particular case. *Wong Sun v. United States*, 371 U.S. 471 (1963).

Here, the officers were advised by Aguirre and Curl of their belief that Friar was the shooter. In addition, they were told that Friar and Aguirre had recently broken up and that he had sent a threatening text message to Aguirre that night. The officers were also informed that Friar had asked Aguirre which bedroom she was sleeping in that night and that he had called her seconds before the shooting. The officers were also advised that Friar had purchased a gun. Moreover, they were aware that Friar was known to be aggressive and combative and that he had been investigated in connection with another shooting. When the totality of the circumstances is considered, we are unable to say that the circuit court clearly erred in ruling that the officers had probable cause to arrest Friar. Therefore, we affirm the circuit court's denial of the motion to suppress on this basis.

B. *Miranda* Rights

In addition to the absence of probable cause, Friar argues that the officers violated his right to counsel and his right to remain silent. He contends that, as a consequence, his three statements to the police should have been suppressed.

At the suppression hearing, it was disclosed that Friar had asked for an attorney multiple times during the booking process. Initially, the officers did not tell Friar why he had been arrested. However, Sheriff David Lucas informed Friar about the reason for his arrest within thirty to forty-five minutes of Friar's arrival. Once the booking process had been completed, Friar was placed in a holding cell. Agents Wendall Jines and Michael McNeil of the Arkansas State Police had been tasked with providing assistance to the Newport Police Department in the investigation. At 7:19 a.m., Jines and McNeil attempted to interview Friar. They advised Friar of his *Miranda* rights, and Friar indicated that he understood them by signing a rights form. However, after completing the rights form, Friar immediately invoked his right to counsel and his right to remain silent. Consequently, the agents discontinued the interview, and no statement resulted from the encounter.

Michael Smith, a jailer whose shift began that morning at 8:00 a.m., testified that Friar got his attention and asked to speak with Officer Benish. Benish then came to the jail to meet with Friar. Benish testified that he reminded Friar that he had earlier declined to visit with the agents from the state police. He said that Friar explained that he did not speak with the agents because he did not know them but that he wanted to talk to Benish. Benish informed Friar of his rights, and Friar agreed to waive them. The rights form signed by Friar was completed at 8:22 a.m., and the interview lasted approximately twenty minutes.

In his statement, Friar denied that he had a gun and that he had been in the vicinity of Aguirre's home after midnight.

Friar gave a statement to Agents Jines and McNeil at 11:19 a.m. Jines testified that he learned that Friar had initiated contact with Benish after refusing to speak with him and McNeil earlier that morning. At the beginning of the taped interview, Jines said to Friar that Friar's agreement to speak with Benish gave Jines the opportunity to talk to him. Jines did not repeat the *Miranda* warnings. Jines testified that Friar did not indicate that he did not wish to speak with them or that he wanted an attorney. During this interview, Jines asked Friar where he was at 2:32 a.m. that morning. Friar told him that he had been on Garfield Street.[4] However, after Jines told Friar that his location could be pinpointed by using cell-phone towers, Friar stated that he was in the Crossroads area of town at that time. At the conclusion of the interview, Friar told the agents that they could talk to him "anytime."

Jines and McNeil met with Friar again that day at 5:34 p.m. At the start of this third interview, the following exchange occurred:

JINES: Robert let me go back over something with you to make sure we understand each other. This morning I came in here and talked to you and you didn't want to talk to me then. Then you called, had them call Chuck Benish. Chuck came up here cause you wanted to talk to him and then I come up here a little while later and I asked if I could talk to you and you said it was okay. Right?

FRIAR: Yeah.

JINES: And I want to talk to you some more right now, is that okay? All right. This is the rights form that I read to you this morning. Do you

---

[4] The testimony established that Garfield Street was 2.7 miles from Aguirre's residence.

> remember me reading that to you and you initialed and signed it. Do you understand your rights?
>
> FRIAR: Yes.
>
> JINES: Okay. It's okay to talk to you?
>
> FRIAR: I don't care.

In this statement, Friar continued to deny that he had shot Aguirre and her child.[5]

For reversal of the circuit court's decision not to suppress these statements, Friar first argues that the officers violated his rights by failing to scrupulously honor his requests for an attorney. The State responds that the statements were not taken illegally because Friar subsequently initiated contact with Officer Benish.

Both the Fifth and Sixth Amendments provide a right to counsel. *Vidos v. State*, 367 Ark. 296, 239 S.W.3d 467 (2006). Under the Fifth Amendment, the right to counsel is derived from the amendment's prohibition against self-incrimination while in custody. *Wedgeworth v. State*, 374 Ark. 373, 288 S.W.3d 234 (2008) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). When the right is invoked, it must be "scrupulously honored." *Fritts v. State*, 2013 Ark. 505, at 8, 431 S.W.3d 227, 231 (quoting *Miranda*, 384 U.S. at 479). Thus, when an accused has invoked his Fifth Amendment right to counsel during custodial interrogation, he cannot be subjected to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication,

---

[5] Jines and McNeil interviewed Friar again the following day. The State did not seek to admit this statement into evidence. During the interview, Friar once again invoked his right to counsel, and the agents stopped questioning him. However, while the agents turned off the audio portion of the recording, the video continued to record their actions, and the tape shows that the agents continued to converse with Friar after he invoked his rights.

exchanges, or conversations with the police. *Stevenson v. State*, 2013 Ark. 100, 426 S.W.3d 416. In other words, an accused may change his mind and decide to talk to law enforcement officials. *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995) (citing *Michigan v. Jackson*, 475 U.S. 625 (1986)). While the accused may initiate further contact with the police, the impetus must come from the accused, not the police. *Airsman v. State*, 2014 Ark. 500, 451 S.W.3d 565. A statement will be admissible only if the accused initiated further contact, and in doing so knowingly and intelligently waived the right he had invoked. *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006).

In this case, the record shows that Friar asked for an attorney during the booking process and that he invoked his rights at approximately 7:19 a.m. during the attempted interview with agents Jines and McNeil. Less than an hour later, Friar, of his own volition, asked to speak with Officer Benish. Benish reminded Friar of his earlier request for an attorney and of his refusal to speak with Jines and McNeil. Benish also advised Friar of his rights, and Friar executed a rights form. Although Friar had previously invoked his rights, he clearly waived them less than an hour later when he initiated further communication with Benish and gave a statement after being informed of his rights. Based on established precedent as applied to the facts of this case, the circuit court's ruling on this point is not clearly erroneous.

The question then becomes whether Friar voluntarily and intelligently waived his rights. Friar asserts that his statements were the product of intimidation and deception rather than a free and deliberate choice. He maintains that the acts of intimidation began when he was arrested at gunpoint by two officers. Friar points out that at first the officers did not

tell him why he had been arrested and that he requested an attorney during the booking process. He claims that Jines threatened to build a capital-murder case against him when he invoked the right to counsel. Friar also contends that the intimidation and deception continued after Friar's interview with Benish. In this regard, Friar argues that, during the interview at 11:19 a.m., Jines gave him the impression that he could not refuse to speak with Jines after having spoken with Benish; that Jines asked him to reveal his cell-phone passcode; and that Jines lied in saying that his location could be pinpointed by use of a cell-phone tower. Friar also maintains that Jines continued to deceive him during the last interview that day by telling Friar that the prosecutor would not cut a deal unless he cooperated; by saying that his clothes would "tell off on" him if there was gunpowder residue; in telling Friar that Aguirre could not talk and might not survive; by advising him that the officers would test the grass on his shoes for comparison with the grass outside Aguirre's home; and by saying that he could receive the death penalty. Further, Friar asserts that he is more vulnerable to suggestion due to his low IQ of 65.

A statement made while in custody is presumed involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Dickerson v. State*, 363 Ark. 437, 214 S.W.3d 811 (2005). In determining whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, we look to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Williamson v. State*, 2013 Ark. 347, 429 S.W.3d 250. In making this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the

SLIP OPINION

accused; the lack of advice as to his constitutional rights; the length of detention; the repeated or prolonged nature of the questioning; the use of physical or mental punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Osburn v. State*, 2009 Ark. 390, 326 S.W.3d 771. We will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).

When we examine the totality of the circumstances, there is no basis to overturn the circuit court's decision. As stated, Friar initiated contact by asking to meet with Benish. Benish referred to Friar's earlier refusal to speak with the agents from the state police, and Friar explained to Benish that he had declined to talk to them only because he did not know them. Before taking the statement, Benish apprised Friar of his rights, and as signified by his signature on the rights form, Friar agreed to waive his rights and to speak with Benish. Although agents Jines and McNeil did not repeat the *Miranda* warnings during the interview at 11:19 a.m., we have recognized that there is no constitutional requirement that a suspect be warned of his *Miranda* rights each time he is questioned. *Bryant v. State*, 2010 Ark. 7, 377 S.W.3d 152. We observe that Friar had been advised of his rights twice in the hours before that statement was taken, and it is significant that Friar understood his rights by invoking them on the first occasion. Also, Friar told the agents at the conclusion of the 11:19 a.m. interview that he would speak with them at "anytime." Moreover, at the interview at 5:34 p.m., Friar acknowledged that he had agreed to speak with the agents earlier that day and that he was willing to meet with them at that time. During the final interview, the agents once again reminded Friar of his rights, and Friar agreed to meet with

them. The totality of the circumstances strongly supports the conclusion that Friar voluntarily agreed to speak with the officers.

Concerning the allegation of intimidation, at the suppression hearing Jines testified that he did not recall telling Friar that he would build a capital-murder case against him. Jines did advise Friar during the interview at 5:34 p.m. that a charge of capital murder could carry the death penalty and that the prosecutor was not likely to be lenient if he did not cooperate. The record also supports Friar's claim that the agents were not completely candid with him, such as when they told him that his location could be pinpointed by use of cell-phone towers. The agents acknowledged that this representation was false because determining the location of a cell phone requires two cell-phone towers, and the area had only one tower. However, the fact that a police officer makes an untrue statement during the course of an interrogation does not necessarily render an otherwise voluntary statement inadmissible. *Goodwin v. State*, 373 Ark. 53, 281 S.W.3d 258 (2008). We have found no fault with an interrogator trying to persuade an accused to tell the truth or to answer questions, even though there may be misrepresentations of fact made by the interrogator, so long as the means employed are not calculated to procure an untrue statement and the confession is otherwise voluntarily made. *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997). "The police may use some psychological tactics and coercive statements in eliciting a custodial statement from the accused so long as the means employed are not calculated to procure an untrue statement, and the accused's free will is not completely overborne." *Osburn,* 2009 Ark. 390, at 54, 326 S.W.3d at 800 (quoting *Rankin v. State*, 338 Ark. 723, 729, 1 S.W.3d 14, 17, (1999)). We cannot say that the tactics employed by the agents were

14

calculated to procure an untrue statement, and as noted above, the statements were otherwise voluntary. It is also well worth noting that nothing the officers said produced a confession, as Friar steadfastly maintained that he was not involved in the shooting. Under the circumstances, we are unable to conclude that Friar's free will was completely overborne during the interviews.

Although mental capacity is a factor to be considered, standing alone it does not support suppression. *Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. Here, the mental–health expert, who testified on Friar's behalf at the hearing, stated that Friar's intelligence quotient placed him in the category of mild intellectual disability. However, the expert said that he was in no position to say that Friar did not understand his rights. Additionally, the fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *Rankin v. State*, *supra*. At the suppression hearing, the State introduced into evidence Friar's numerous previous convictions, which demonstrate that Friar was well-acquainted with the criminal-justice system. All things considered, we affirm the circuit court's ruling denying Friar's motion to suppress.

### III. *Motion in Limine*

Friar next argues that the circuit court committed reversible error by granting the prosecutor's motion in limine to exclude testimony that a third person had confessed to the crimes. He asserts that the testimony qualifies for admission as a statement against interest. In response, the State counters that the testimony is not admissible on that basis because the statement is not clearly trustworthy.

As pertinent to this issue, on May 4, 2015, a month before the trial, the prosecutor met with Friar's aunt, Bessie Brandon, who reported that Tony Miller had confessed to her that he had "killed that baby." Miller had died of ventricular fibrillation caused by cocaine abuse on March 31, 2013, approximately one month after the shooting. Although Miller's death certificate stated that the manner of death was an accident, Friar represented to the circuit court that Bessie believed that Miller had actually committed suicide because of what he had allegedly done. Relatedly, Albert Brandon, Bessie's son and Friar's cousin, had directed the police to the location of a handgun that was forensically tied to the shooting. In arguing the State's motion in limine to exclude Bessie's testimony, the parties advised the circuit court that Brandon had made a statement to the police the day of the shooting, in which Brandon said that Friar had given him the gun; that Miller told Brandon to get rid of it; and that Miller took Brandon to the river to dispose of the gun. It was also disclosed that Bessie had given another statement to the police in which she professed to know nothing about the shooting. The circuit court granted the State's motion to exclude Bessie's testimony concerning Miller's confession.

Pursuant to Rule 804(b)(3), a statement against interest is an exception to the rule against hearsay, provided that the declarant is unavailable. The rule states in pertinent part,

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offering to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

SLIP OPINION

For a statement tending to expose the declarant to criminal liability and offered to exculpate the accused to be admissible under Rule 804(b)(3), the proponent of the testimony must show (1) that the declarant is unavailable, (2) that the statement was at the time of its making "so far tended to subject him to criminal liability" that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement. *Winters v. State*, 2013 Ark. 193, at 11, 427 S.W.3d 597, 604 (citing *Williford v. State*, 300 Ark. 151, 155, 777 S.W.2d 839, 842 (1989)). We have defined the term "trustworthy" to mean deserving of confidence; dependable; reliable. *Welch v. State*, 269 Ark. 208, 599 S.W.2d 717, *cert. denied*, 449 U.S. 996 (1980). In determining the trustworthiness of a statement against the declarant's penal interest, a court may consider "the probable veracity of the in-court witness, and the reliability of the out-of-court declarant." *United States v. Rasmussen*, 790 F.2d 55, 56 (8th Cir. 1986) (quoting *United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978)). Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686.

In the present case, the State does not dispute that Miller is unavailable and that Miller's admission tended to subject him to criminal liability. At issue is whether Friar presented to the circuit court corroborating circumstances that clearly demonstrate the trustworthiness of the statement. In his argument to the circuit court, Friar maintained that Miller's statement was trustworthy because, according to Brandon's statement, Miller had expressed an interest in disposing of the gun. Friar also insinuated that Brandon might have

SLIP OPINION

received the gun from Miller. In addition, Friar asserted that Bessie did not come forward with the information because Miller was her friend and she wanted to protect him. In response, the prosecution pointed out that Bessie was related to Friar; that she had given inconsistent statements about her knowledge of the crimes; and that she did not disclose Miller's confession until the eve of trial and over two years after the shooting had occurred. Citing *United States v. Bobo*, 994 F.2d 524 (8th Cir. 1993), the prosecution also asserted that Miller's drug usage cast doubt on the reliability of his statement.

Given the arguments presented to the circuit court, we discern no abuse of discretion in its decision to exclude the testimony. The circuit court considered Miller's drug usage in assessing his reliability. The court also took into account the inconsistencies between Bessie's statements, and the timing of her disclosure, as well as her familial relation to Friar. The circuit court could discard Friar's explanation for Bessie's failure to come forward sooner because Miller was dead and no longer in need of protection, while her nephew was in jail and facing the charges. The circuit court was apprised of Brandon's statement that Friar had given him the handgun, and not Miller. Otherwise, the record reveals scant information surrounding the circumstances of Miller's alleged revelation to Bessie. We know only that the two were friends and that the statement was made in the month after the shooting and before Miller's death. Based on this record, we hold that the circuit court did not err in ruling that Friar failed in his burden of demonstrating trustworthiness of the statement.

IV. *Lesser-Included Offenses*

SLIP OPINION

In his last issue on appeal, Friar claims error in the circuit court's denial of his request for instructions on first-degree murder and second-degree murder as lesser-included offenses to the charge of capital murder, as well as instructions on attempted first-degree murder and attempted second-degree murder as lesser-included offenses to attempted capital murder. He argues that there was a rational basis to support the instructions on the lesser-included offenses, even though his defense was that he was not the perpetrator of the shooting. Friar asserts that, based on the evidence, the jury might have concluded that, if he was the shooter, he may not have known that anyone was in the bedroom; that he meant to injure but not to kill; or that he acted either knowingly or purposely, rather than with premeditated intent. The State responds that no rational basis exists for giving instructions on lesser-included offenses because Friar denied that he had committed the shooting.

We have often stated that the refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence. *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158. However, we will affirm the circuit court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Jones v. State*, 2012 Ark. 38, 388 S.W.3d 411. It is well settled that when a defendant makes a claim of innocence, no rational basis exists to instruct the jury on a lesser-included offense because the jury need only determine whether the defendant is guilty of the crime charged. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005); *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002); *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001).

SLIP OPINION

Given Friar's defense of complete denial of any wrongdoing, we hold that the circuit court did not abuse its discretion by not giving instructions on lesser-included offenses. In *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986), this court made clear that there is no rational basis for giving an instruction on a lesser-included offense where the defense is based on a claim of innocence. Subsequently, in *Brown v. State*, 321 Ark. 413, 903 S.W.2d 160 (1995), *cert. denied*, 524 U.S. 909 (1998), we reaffirmed our position that no rational basis exists for instructions on lesser-included offenses when the defendant denies that he committed the offense. The *Brown* court observed that we had "wisely and consistently" applied this rule over the "past century," and we "fail[ed] to find good reason" to overturn that body of law. *Brown*, 321 Ark. at 416, 903 S.W.2d at 162. We concluded the discussion by saying, "Sound reason undergirds the established legal principle in issue here, and *stare decisis* dictates our continued application of it." *Id*. The same holds true here. The circuit court relied on this principle of law in refusing to give instructions on lesser-included offenses. Certainly, it cannot be said that the court abused its discretion by adhering to precedent long established by this court.[6]

V. *Rule 4-3(i) Review*

---

[6] In her dissent, Justice Hart's reliance on *Henson v. State*, 296 Ark. 472, 757 S.W.2d 560 (1988), is misplaced. There, a jury convicted Henson of aggravated robbery, and the issue on appeal was whether the circuit court had erred in refusing to give an instruction on the lesser-included offense of robbery. The evidence showed that Henson put his hand in either his coat or pocket after he was caught in the act of robbing a safe. We concluded that the case was not one of "all or nothing" and that a rational basis existed for giving a simple robbery instruction because the question whether Henson was armed with a deadly weapon was susceptible to more than one interpretation. By contrast here, the giving of instructions on lesser-included offenses is inconsistent with Friar's admitted defense of complete denial. Thus, there is no rational basis to support instructions on lesser-included offenses.

Pursuant to Arkansas Supreme Court Rule 4–3(i), the record has been reviewed for all errors prejudicial to Friar. No reversible error has been found.

Affirmed.

BAKER, J., concurs.

BRILL, C.J., and DANIELSON and HART, JJ., dissent.

**KAREN R. BAKER, Justice, concurring.** I concur in the decision to affirm the circuit court, but I write separately because I would apply a different analysis to Friar's claim that the circuit court erred in denying his request for instructions on first-degree murder and second-degree murder as lesser-included offenses to the charge of capital murder, as well as instructions on attempted first-degree murder and attempted second-degree murder as lesser-included offenses to attempted capital murder. Because the evidence in this case does not support that a rational basis exists for giving the lesser-included instructions, I would affirm the circuit court.

Friar was convicted of capital murder, which requires proof that "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5–10–101(a)(4) (Repl. 2013). "Premeditation and deliberation may be formed in an instant. *Winston v. State*, 372 Ark. 19, 269 S.W.3d 809 (2007). Intent can rarely be proved by direct evidence; however, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Robinson v. State*, 363 Ark. 432, 214 S.W.3d 840 (2005)." *Marcyniuk v. State*, 2010 Ark. 257, at 9, 373 S.W.3d 243, 250.

Here, Friar requested a jury instruction on first–degree murder, which requires proof that "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2). A person acts "purposely" with respect to "a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1). Friar also requested a jury instruction on second–degree murder, which requires proof that the "person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life," or "[w]ith the purpose of causing serious physical injury to another person, the person causes the death of any person." Ark. Code Ann. § 5-10-103(a). A person acts "knowingly" with respect to a "result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(B).

The test for whether an instruction should be given is whether there is the slightest evidence to support the instruction and whether there is no rational basis for giving the instruction. *Morris v. State*, 351 Ark. 426, 432, 94 S.W.3d 913, 917 (2003). Accordingly, in reviewing whether slight evidence or a rational basis exists for giving the instructions, the court considers what evidence Friar could have relied on as a rational basis to support giving the instructions. Friar must point to evidence in the record that supports a finding that he acted knowingly or purposely. *See Flowers v. State*, 362 Ark. 193, 213, 208 S.W.3d 113, 129 (2005).

In the instant case, Friar is unable to point to any evidence in the record that would support the lesser-included instructions that he acted knowingly or purposely rather than with premeditated and deliberate intent. Instead, he summarily asserts that,

> Counsel . . . reasoned that this is not a case of all o[r] nothing such as a case in which someone walks up to someone and executes them, rather this case involves a shooting from outside the house. . . Thus jurors could decide that even if Friar was the shooter, he might not have known anyone was in the room into which he shot FN1; or that he meant to injure, but not kill anyone; or that he did this knowingly or purposefully, rather than premeditated intent.
>
> > FN1. [Aguirre's] admission that the room she was sleeping in that night, for the first time, was not her usual place to sleep, supports this theory.

Despite Friar's claim, Friar does not point to any evidence to support his position. The record demonstrates that Friar sent the following text message to Aguirre hours before the shooting:

YEA I WILL HAVE THE LAST SAY SO U N UR MOM TELL D KIDS U LOVE THEM.

The evidence also demonstrates that Aguirre testified that seconds prior to the shooting, at 2:32 a.m., she was sitting on the side of her bed and felt her phone vibrate as she was receiving an incoming call. She testified that she reached underneath her pillow to retrieve her phone, that Friar was calling her, and that she accidentally answered his call and then said "hello." She testified that he "said something into the phone and hung up. And then shots were fired." She testified that she knew it was Friar calling because she had his name and picture saved for when he called and she heard his voice. Aguirre also testified that when she answered her phone that the light on her phone illuminated, her bedroom light was off and she was facing the window. Additionally, Arkansas State Police Criminal

Investigator Special Agent Mike McNeil testified that seven shots were fired through Aguirre's bedroom window. He testified that the bed where Aguirre and her children were sleeping was pushed up against the wall in the corner of the bedroom adjacent to the window. Special Agent McNeil further testified that the bullets traveled through the four-paneled window into the bedroom. Specifically, he testified that seven shots were fired through the bottom left window pane which was immediately adjacent to the bed, and the bullets traveled at a significant downward angle toward the bed that was located right below the window.

Based on my review of the record, as well as the facts and evidence introduced at trial, the record does not support a rational basis to support giving the lesser–included instructions. In sum, the evidence demonstrates the following:

Friar had threatened Aguirre in a text message earlier in the evening.

Moments before the shooting, Friar called Aguirre. Aguirre, while sitting on the edge of the bed in her bedroom and facing the window with the lights out, answered Friar's call, which illuminated her phone and the bedroom.

Seconds after answering Friar's call, a gun was used to fire seven shots through Aguirre's bedroom window.

The shots were fired through the same lower left pane directly at the bed where Aguirre was located.

Accordingly, the evidence supports that Friar acted with premeditated and deliberated intent and does not provide a rational basis to support giving the lesser–included instructions.

**PAUL E. DANIELSON, Justice, dissenting.** I respectfully dissent. I would reverse and remand on the basis that the officers lacked probable cause to arrest Friar on the

information they had at the time of the warrantless arrest.[1] As a former city attorney, deputy prosecutor, trial judge, and current appellate judge, I appreciate and understand pressure faced by law-enforcement officers to find the person responsible for taking someone's life, especially the life of a child. However, we must always be mindful of a person's constitutional rights and the duty of law enforcement to follow proper legal procedures in making an arrest. In my opinion, the proper legal procedures were not followed in this case, leading to Friar's unlawful arrest. While probable cause does not require a degree of proof sufficient to sustain a conviction, a mere suspicion or even a "strong reason to suspect" will not suffice. *See Friend v. State*, 315 Ark. 143, 147, 865 S.W.2d 275, 277 (1993) (quoting *Roderick v. State*, 288 Ark. 360, 363, 705 S.W.2d 433, 435 (1986)). The issue of whether the officers in this case had probable cause to arrest Friar is based on the officers' knowledge at the moment of arrest. *See id*. According to the testimony of the officers, the following facts were known to officers at the time of the warrantless arrest: (1) that shots were fired into the window from the outside of Aguirre's apartment; (2) that the shooter had not entered the house; (3) that Aguirre and her mother stated that Friar was responsible for the shooting; (4) that there was no evidence that anyone saw the shooter; (5) that Aguirre told Detective Benish that she received a text message from Friar stating that Aguirre and her mother should tell their kids that they loved them; (6) that Curl told Lieutenant Edwards that the text message from Friar told them to kiss their babies; (7) that Aguirre said that Friar called her before the shooting and that she did not understand what was being said in the

---

[1] I also dissent for the reasons stated in Justice Hart's dissenting opinion, which I join.

call, but recognized the voice as Friar's; (8) that she had not seen Friar in two days; and (9) that Aguirre implied that she and Friar had been in a relationship that had recently ended.

The State's primary argument to support its claim that the officers had probable cause to arrest Friar is that Aguirre and Curl told the officers that Friar was the shooter. The State admits that the officers never asked Aguirre or Curl whether they had actually seen Friar fire the shots. In an attempt to explain why the officers arrested Friar without any evidence that he was the shooter, the State claims that at the time of the arrest, the officers were not aware that no one had seen Friar shooting the gun. Following this flawed logic, anyone could have been arrested for this shooting based simply on a statement by another person.

There has been no explanation by the State as to why the officers never asked the crucial question of whether Friar had been seen firing the shots. The State had no evidence at the time of the arrest other than mere statements from Aguirre and Curl that Friar was the shooter. In fact, when interviewed at the hospital, Aguirre testified that she had not seen Friar in two days. In this case, at the most, the officers had reason to suspect that Friar was the shooter, which does not amount to probable cause. Taking into account all of the information that the officers had (and did not have) in their collective knowledge at the time of the arrest, I would hold that they lacked probable cause to arrest Friar. For the reasons set forth above, I would reverse and remand.

**JOSEPHINE LINKER HART, Justice, dissenting.** I respectfully dissent from the majority's conclusion that the circuit court did not err in refusing to grant Robert Friar's request to instruct the jury on the lesser-included offenses of first-degree murder and second-degree murder, as well as instructions on attempted first-degree murder and

attempted second-degree murder. Further, I dissent from the majority's analysis regarding whether the circuit court committed error in excluding an out-of-court declarant's confession to the crimes. The majority cites *Brown v. State*, 321 Ark. 413, 903 S.W.2d 160 (1995), *cert. denied*, 524 U.S. 909 (1998), and *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986), for the proposition that there is no rational basis for giving an instruction on a lesser-included offense when the defense is based on a claim of innocence. Although Robert Friar pleaded not guilty, he did not present any evidence at trial. This distinction is critical in deciding whether *Brown* and *Doby* require that the circuit court deny a defendant's request for a jury instruction on a lesser-included offense.

When the defendant takes the stand and denies having committed the offense, then according to *Doby* and its progeny, the jury must either believe the State's case and convict, or believe the defendant's case and acquit. However, when the defendant does not present evidence, the jury is not faced with an all-or-nothing situation. In *Henson v. State*, 296 Ark. 472, 757 S.W.2d 560 (1988), this court considered the application of *Doby*, 290 Ark. 408, 720 S.W.2d 694, and reached the conclusion that, in a situation in which the defendant "did not take the stand to deny his guilt," it did not "lessen the state's burden," as his "not guilty plea put the burden on the state to prove his guilt." *Id.* at 474, 757 S.W.2d at 561. The court held that when "the facts are susceptible of more than one interpretation, a lesser included offense instruction should be given." *Id.*, 757 S.W.2d at 561. The court stated, "This is not a case of all or nothing." *Id.* at 475, 757 S.W.2d at 561. Thus, when the defendant does not present a defense at trial, the court should consider whether the facts

presented by the State are susceptible of more than one interpretation. If so, a lesser-included-offense instruction should be given.

Friar was convicted of capital murder, which requires proof that "[w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Repl. 2013). Friar requested a jury instruction on first-degree murder, which requires proof that "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2). A person acts "purposely" with respect to "a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1). He also requested a jury instruction on second-degree murder, which requires proof that the "person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life," or "[w]ith the purpose of causing serious physical injury to another person, the person causes the death of any person. Ark. Code Ann. § 5-10-103(a). A person acts "knowingly" with respect to a "result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(B).

Here, the facts presented by the State are susceptible of more than one interpretation relating to Friar's intent. Delana Aguirre testified that the shooter fired a weapon through a bedroom window. The lights were out in the bedroom, and the window blinds were closed, precluding her from seeing outside the window. Because the shots were fired through a bedroom window where the blinds were shut and the lights were out, the facts presented

are susceptible to the interpretation that the shots were neither fired specifically at anyone nor fired with the intent to cause anyone's death. As *Henson* holds, in such instances the jury should be instructed on the lesser-included offenses so as to put the burden on the State to prove the defendant's guilt.

This court has acknowledged many times that an instruction on a lesser-included offense is appropriate when it is supported by even the slightest evidence, and an instruction should be excluded only when there is no rational basis for giving it. *See, e.g.*, *Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136, 150 (2003). Recently, we restated our assertion that "no right has been more zealously protected by this court than the right of an accused to have the jury instructed on lesser–included offenses." *Starling v. State*, 2016 Ark. 20, at 12, 480 S.W.3d 158, 165. Here, the circuit court abused its discretion in denying Friar's request to submit a jury instructions on the lesser-included offenses. Thus, I respectfully dissent.

I further dissent from the majority's analysis relating to the admissibility of Tony Miller's out-of-court confession to the crimes. It is an open question whether Rule 804(b)(3) of the Arkansas Rules of Evidence obligates this court to inquire into the trustworthiness of the witness, Bessie Brandon, who would have related to the jury the declarant's confession. As one court noted,

> A strong argument can be made that the credibility of the witness is irrelevant to admissibility under Rule 804(b)(3), which is basically a hearsay rule. A test for admissibility of hearsay statements based on the credibility of the witness who testifies about the statement is unrelated to the purpose of the general rule against hearsay. Hearsay statements are usually excluded because the declarant is unsworn and unavailable for cross-examination and because the jury cannot evaluate his demeanor. Consistently with these rationales, exceptions to the hearsay rule in Rules 803 and 804 are made because the circumstances of the declaration indicate that the declarant's perception, memory, narration, or sincerity concerning the matter asserted in the statement is trustworthy. The jury can evaluate the perception,

memory, narration, and sincerity of the witness who testifies about the hearsay declaration, and that witness testifies under oath and subject to cross-examination. To exclude a hearsay statement because of doubt that it was made is to exclude it not because of its hearsay nature but for some other reason. Although some other rule of evidence (possibly Rule 403) may give the judge the authority to exclude evidence on that other basis, Rule 804(b)(3), to the extent that it is a hearsay rule, does not.

*United States v. Satterfield*, 572 F.2d 687, 691–92 (9th Cir. 1978) (citations omitted).

Essentially, the majority affirms the circuit court's exclusion of Miller's statement by focusing on whether Bessie Brandon was credible. Bessie Brandon's credibility, however, was a question for the jury, not the trial judge. As *Satterfield* suggests, the focus should have been on the facts relating to the trustworthiness of Miller's statement. Those facts would have included Albert Brandon's testimony that Miller told him how to dispose of the weapon, as well as his intimation that Miller gave him the gun. Thus, I respectfully dissent from the majority's analysis on this issue.

BRILL, C.J., and DANIELSON, J., join in this dissent.

*Janice W. Vaughn*, Arkansas Public Defender Commission, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.