Cite as 2026 Ark. App. 248

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CR-25-388

VINCENT TYLER

APPELLANT

V.

STATE OF ARKANSAS

APPELLEE

Opinion Delivered April 22, 2026

APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT
[NO. 35CR-23-312]

HONORABLE ALEX GUYNN, JUDGE

AFFIRMED

**CASEY R. TUCKER, Judge**

Vincent Tyler appeals his conviction of first-degree murder with a firearm enhancement in the Jefferson County Circuit Court. On appeal, Tyler argues that the circuit court erred in submitting a nonmodel jury instruction on flight when there was no evidence he had fled and in denying his motions to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter. We affirm.

The State charged Tyler with capital murder, alleging that on May 18, 2023, he caused the death of John Payne with premeditated and deliberated purpose. The State alleged that Tyler was subject to a firearm enhancement. The trial took place on March 20, 2025.

John Payne was shot and killed on May 18, 2023. According to Dr. Adam Craig, who performed the autopsy, Mr. Payne died of multiple gunshot wounds. Two bullets entered the right back side of Mr. Payne's scalp, traveled upward through his brain from right to left,

and exited through a shared wound on the left upper part of his scalp. A third bullet entered Mr. Payne's head further down on the right side and traveled right to left and slightly upward below his brain case before exiting his left cheek. The fourth bullet entered the right back side of his neck, traveled slightly upward, also right to left, and exited through his left lower cheek. A fifth bullet entered Mr. Payne's upper right back, came out the top of his shoulder, and entered his neck where it lodged underneath his skull. The sixth gunshot was to the back of Mr. Payne's right shoulder; this bullet traveled through the humerus before exiting through the front of his shoulder. The two bullets that traveled through Mr. Payne's brain, alone, would have been fatal, and the two that exited his left cheek could have proved fatal. Dr. Craig determined that Mr. Payne died as the result of multiple gunshot wounds and that his manner of death was homicide.

Anthony Morehead, an armed guard for Valero, testified that he had just left work and was walking home on May 18 when he heard gunshots. As he went in the direction of the gunshots, a woman approached him and told him she needed to use a phone. A "guy" on a bicycle passed between Morehead and the woman so closely that he almost hit the woman. The person on the bicycle appeared to hand something to the woman, or vice versa, then rode away. Morehead offered the woman his phone, but she did not reply, so he continued walking. He then saw a truck in the middle of the street with its lights on. This was when he called 911. When Morehead first saw the woman in the street, she appeared to be coming from the truck. The woman turned out to be Melissa Colbert, Tyler's mother.

Morehead's recorded call to 911 was played for the jury. In that call, Morehead identified himself then told the operator that as he was heading home from work and walking down 23rd Street, he heard "a lot of gunshots." Then he saw a heavyset woman in a thin dress pacing back and forth. She would not answer him when he asked if there was a shooting. Morehead told the operator that there was a truck sitting in the middle of the street with its lights on, possibly still running, and he thought the driver had been shot and was probably dead.

Colbert testified that she and Mr. Payne had dated for approximately ten years. Tyler and Mr. Payne knew each other. Colbert never saw them have an altercation. Colbert previously had given a sworn statement to the police, and the State played the recording for the jury. In the statement, Colbert told the police that on the night Mr. Payne was killed, she, Tyler, and Mr. Payne were in Mr. Payne's pick-up truck together. Mr. Payne was driving; she was in the front seat, and Tyler was sitting behind her in the back seat. A friend of Tyler's deceased brother, Paul Haltiwanger, Jr., had been in the truck, but they dropped him off where he lived and then headed back to Colbert's mother's house where she was living. Suddenly Colbert saw bright flashing lights, and the truck stopped. Mr. Payne slumped forward, and Colbert exited the truck. She went to call for help and ran down the street to her cousin's house. She did not know where Tyler went but thought he also went to call someone. Colbert called Mr. Payne's aunt, who picked her up and took her to the hospital. When they arrived at the hospital, they were told that Mr. Payne was not there. Colbert first

said she had not seen Tyler since Mr. Payne was shot, but she later changed her answer and said Tyler had been by her mother's house where they were staying.

After the audiotaped interview was played for the jury, direct examination continued. Colbert denied that the recording refreshed her memory. She also denied having told the police that Tyler always caried a gun. Colbert testified on cross-examination that she hears a woman's voice in her head and that she had been hearing it since she was in her early twenties. She is on medication for bipolar disorder and schizophrenia. Colbert reluctantly agreed with the State that she, Mr. Payne, and Tyler were the only ones in the truck at the time of the shooting. She denied having shot Mr. Payne. Colbert testified that all her children had a good relationship with Mr. Payne.

MD Shahriyar—the crime-scene technician for the Pine Bluff Police Department— testified that when he arrived on the scene, Mr. Payne was already deceased. His body was still buckled into the seatbelt of the driver's seat of his truck. There was a bullet hole on the driver's side window and outside mirror. There were no bullet holes on the passenger side of the truck. There were shell casings inside and outside the truck. Officer Shahriyar observed and photographed the victim with gunshot wounds to the right side of his head, neck, and shoulder. He also photographed the blood splatter on the inside of the driver's-side pillar of the truck. There was no blood splatter on the passenger side of the truck. The casings were all the same caliber. Officer Shahriyar did not find a firearm at the scene. Jennifer Floyd, who works at the Arkansas State Crime Laboratory, examined the bullets and casings and determined that they had all been fired from the same gun.

Paul Haltiwanger, Jr., testified that he knew Colbert because he was friends with Colbert's younger son who recently had died. Colbert and Mr. Payne had given him a ride home the night of the shooting. Haltiwanger was seated behind the driver, Mr. Payne. Tyler also was in the truck, seated on the passenger side of the backseat, behind Colbert. Before the truck reached Haltiwanger's house, they stopped and picked up a man who smelled like liquor. Haltiwanger got out of the truck at his house before the shooting took place.

Sergeant Chris Wieland of the Pine Bluff Police Department testified that he investigated this shooting, beginning at the crime scene on the night it happened. He observed the victim in the driver's seat of the truck. He also observed a bullet hole in the driver's-side rearview mirror on the car door and in the door window. He concluded, from his experience, that the bullet came from inside the car. Due to the location of the victim, the victim's wounds, and the casings and projectiles, Sergeant Wieland concluded that the shooter was sitting on the passenger side of the back seat. Sergeant Wieland interviewed Colbert the night of the shooting and learned that she, Haltiwanger, and Tyler had been in the truck with Mr. Payne and had let Haltiwanger out of the truck before the shooting occurred. When Sergeant Wieland interviewed Haltiwanger, Haltiwanger told him they had picked up another person but had let him out of the truck. Colbert told him that she, Tyler, and Mr. Payne were the only people in the truck when Mr. Payne was shot. Tyler turned himself in on June 10, almost a month after the incident, and requested an attorney.

At the close of the State's case, Tyler's attorney moved for a directed verdict, summarizing his argument as "our position [is] that the State didn't meet its burden,

5

conflicting testimony of whether Vincent Tyler was there at the time of the murder." The court denied the motion. Tyler did not call any witnesses and renewed his motion for directed verdict, which was denied.

The State requested that the jury be instructed on capital murder and the lesser-included offense of first-degree murder. Tyler's counsel requested jury instructions on the lesser-included offenses of second-degree murder and manslaughter, to which the State objected. The court denied Tyler's request for those instructions without argument on the issue. Tyler's attorney proffered the instructions for the record.

While instructing the jury, the court paused to call a bench conference and stated that it did not recall anything about flight. The State responded that Tyler did not remain at the scene of the shooting and did not turn himself in until almost a month later. Defense counsel responded that there was no evidence that Tyler fled the scene "as an admission or inadmission of guilt." The court determined that it would give the instruction and instructed the jury as follows: "Evidence that the defendant fled to avoid arrest or detention by the police may be considered by you in your deliberations as circumstantial evidence corroborative of guilt of the defendant."

During closing argument, Tyler's counsel argued that the State failed to prove that Tyler was the person who shot Mr. Payne, stating, "We're here for this—is—did this man do it?" He argued, "My point is, you can't prove beyond a reasonable doubt that it was Vincent Tyler that killed John Payne." Trial counsel argued that the State's case was weak and that it

did not present any type of images or produce a weapon or "somebody definitively placing him at the scene, besides law enforcement."

The jury found Tyler guilty of first-degree murder and that he had used a firearm in committing the murder. The jury affixed his sentence at forty years in the Arkansas Division of Correction on the first-degree-murder charge and fifteen years' incarceration on the firearm enhancement. The court sentenced Tyler accordingly and ordered that the sentences run consecutively. Tyler timely appealed.

I. *Whether the Circuit Court Erred in Instructing the Jury on*
*Fleeing as Evidence of Guilt*

On appeal, Tyler first contends that the circuit court erred in giving a nonmodel jury instruction on fleeing as circumstantial evidence of guilt. He argues that there was no evidence that he fled following the shooting. Tyler further argues on appeal that in discovery, he had asked the State to provide him with evidence of other crimes pursuant to Arkansas Rule of Evidence 404, and the State had not produced this evidence. He asserts that the Arkansas Model Jury Instructions state that when evidence of other crimes is being admitted into evidence, the court should give AMI Crim. 2d 203, which was not done in this case. The only part of Tyler's appellate argument on this point that is preserved for this court's consideration is the argument that there was no evidence of fleeing to support giving the instruction. Since he did not raise the other particulars of his appellate argument in the circuit court below, we do not address them on appeal. *See Anderson v. State*, 2015 Ark. 18, 454 S.W.3d 212 (stating that an appellant is limited to the scope and nature of his arguments

7

raised before the circuit court, and this court will not consider arguments that were not considered by the court below).

The standard of review regarding the use of jury instructions is abuse of discretion. *Bynum v. State*, 2021 Ark. App. 298, 626 S.W.3d 154. "Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently thoughtlessly, or without due consideration." *Doerhoff v. State*, 2023 Ark. 149, at 4–5 675 S.W.3d 877, 882. This court's role on appeal is not to weigh the evidence but to determine whether there is any evidence to support the jury instruction. *Mitchell v. State*, 2025 Ark. App. 233, 711 S.W.3d 838. "A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction." *Bynum*, 2021 Ark. App. 298, at 13, 626 S.W.3d at 162.

In the present case, the evidence was that the bullets that killed Mr. Payne came from the back seat of the truck. There was evidence that Tyler was one of two passengers in the truck when the shooting occurred. After the shooting, Tyler left the scene. Nearly a month passed before he reappeared, turning himself in to the police. These facts provide "some basis in the evidence" to support giving the instruction on fleeing.[1]

---

[1]We note that the court instructed the jury with a nonmodel jury instruction, and such instructions should be given only when the model instructions do not correctly state the law or there is no model jury instruction on the subject. *Smith v. State*, 2025 Ark. 26, 708 S.W.3d 336. There is no model instruction on fleeing as evidence corroborative of guilt. *Id.* However, the instruction the circuit court gave in this case is a correct statement of the

Since there was some basis in the evidence to support giving the instruction on fleeing and the instruction given was a correct statement of the law, the circuit court did not err in giving it.

## II. *Whether the Circuit Court Erred in Refusing to Instruct the Jury on Second-Degree Murder and Manslaughter*

Tyler argues that the circuit court erred in refusing to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter. We disagree.

It is reversible error to refuse to instruct the jury on lesser-included offenses when such instruction is supported by the slightest evidence. *Montgomery v. State*, 2024 Ark. App. 302, 689 S.W.3d 463. Conversely, the circuit court may refuse to instruct on a lesser-included offense when there is no rational basis to acquit on the charged offense and convict on the lesser-included one. *Id.* As this court has explained, "it is not erroneous for the circuit court to decline to give the proffered instruction on the lesser offense when the evidence clearly shows that the defendant is either guilty of the greater offense charged or innocent." *Id.* at 11, 689 S.W.3d at 470. It follows that when the defendant claims innocence, there is no need to instruct on the lesser offenses.

Tyler was convicted of first-degree murder as defined by Arkansas Code Annotated section 5-10-102(a)(2) (Supp. 2025), that "with the purpose of causing the death of another person, [he caused] the death of another person." "A person acts purposely with respect to

---

law. In fact, it is identical to the instruction used by the circuit court and affirmed on appeal in *Smith*, *supra*.

his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2024). Tyler had requested and was denied an instruction on second-degree murder pursuant to Arkansas Code Annotated section 5-10-103(a)(1) (Repl. 2024), which provides that a person commits second-degree murder if "the person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life." As to the culpable mental state provided in subdivision (a)(1), a person acts "knowingly" with respect to the person's conduct or attendant circumstances "when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist." Ark. Code Ann. § 5-2-202(2)(A). The mental state of "purposely" encompasses the mental state of "knowingly." *Marshall v. State*, 2021 Ark. 158, 627 S.W.3d 810. In the present case, there was no rational basis for an instruction on second-degree murder.

In *Cypert v. State*, 2025 Ark. 11, at 11, 705 S.W.3d 496, 502, the supreme court explained that "a defendant is not entitled to a second-degree murder instruction where all the evidence supports the conclusion that the defendant acted solely with the purpose of killing the victim." The court in *Cypert* determined that the appellant was not entitled to the lesser-included-offense instruction because he followed the victim out of a house and fired a high-velocity rifle at her six times. The fact that some of the shots were nonlethal and some missed did not negate his intent to kill the victim. And, as in the case at bar, the evidence in *Cypert* was that the fatal shots were not the result of an atypical trajectory or a warning shot gone wrong or a misfire, which supported the finding of purposeful intent.

The court concluded that no rational basis existed to acquit the appellant on the first-degree-murder charge and convict him of second-degree murder.

Similarly, in *Dixon v. State*, 2019 Ark. 245, 581 S.W.3d 505, the supreme court affirmed the lower court's decision to refuse an instruction on second-degree murder. The appellant in *Dixon* was convicted of first-degree murder for shooting the victim in the head at close range and argued that the court erred in refusing the second-degree-murder instruction. The supreme court disagreed, stating that there was no evidence of any argument or altercation, nor was there evidence that the victim brandished his firearm. The evidence was consistent that Dixon shot the victim in the head at close range in the absence of any provocation. In affirming the circuit court, the supreme court stated that there was no rational basis for giving the lesser instruction. This reasoning directly applies to the case at bar.

In the present case, no witness testified that there was an altercation or argument or weapon brandishing. In fact, Colbert testified to the opposite, averring that her children had a good relationship with the victim and that she had never seen Tyler and Mr. Payne have an altercation. The evidence was simply that Tyler was the only person sitting in the backseat of the truck when Mr. Payne was shot six times in the back of the right side of his head, his neck, and his shoulder. Further, the evidence was that all the shots were fired from the same firearm and from within the vehicle. In the face of undisputed evidence that Mr. Payne was shot six times in the same area at such close range, it is clear that the shooter acted

with the purpose of causing Mr. Payne's death. There was no rational basis for acquitting him of first-degree murder and convicting him of the lesser offense of second-degree murder.

Tyler also requested an instruction on manslaughter pursuant to Arkansas Code Annotated section 5-2-104(a)(1) (Repl. 2024), that he "recklessly caused the death of John Payne." A person acts "recklessly" when he "consciously disregards substantial and unjustifiable risk that the attendant circumstances exist or the result will occur." Ark. Code. Ann. § 5-2-202(3)(A). The risk must be of a nature that disregarding it constitutes a gross deviation from the standard of care that a reasonable person would exercise. *Id.* § 5-2-202(3)(B). In *Ellis v. State*, 345 Ark. 415,, 418, 47 S.W.3d 259, 261 (2001), the supreme court agreed with the circuit court's refusal to give a reckless-manslaughter instruction. In doing so, the court stated that the appellant's argument that his conduct could be found to be reckless when he shot the victim in the stomach at a range of three to five feet was "wholly without merit." Similarly, in *Bankston v. State*, 361 Ark. 123, 205 S.W.3d 138 (2005), the supreme court held that firing a gun four times into a car known to be occupied went beyond a gross deviation from the standard of care that a reasonable person would exercise; thus, the circuit court did not err in refusing to instruct the jury on reckless manslaughter. In the present case, in which the evidence was that Tyler shot Mr. Payne in the head, neck, and shoulder at a range of about three feet, Tyler's argument that the court should have given the reckless-manslaughter instruction is wholly without merit.

In addition to the evidentiary bases already discussed, we note that a circuit court does not err in refusing lesser-included-offense instructions when the defendant's only

12

defense is innocence. In *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491, the appellant appealed his conviction of first-degree murder and argued on appeal that the circuit court erred in refusing to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter. The supreme court disagreed, stating:

> Armstrong did not introduce any evidence to show that he shot the victim but that the murder was committed in self-defense or under the influence of extreme emotional disturbance. Rather, he argued only that Thornton shot herself. *We have held that no rational basis exists for giving a lesser-included instruction when the defense to the charge is a total denial of wrongdoing. See, e.g.,* *Friar v. State*, 2016 Ark. 245 (affirming refusal to give lesser-included instructions on first- and second-degree murder where defense was that appellant was not the perpetrator of the shooting); *Brown v. State*, 321 Ark. 413, 903 S.W.2d 160 (1995), *cert. denied*, 524 U.S. 909 (1998) (holding that lesser-included-offense instruction for possession of controlled substance was properly rejected where appellant's entire defense was based on alibi theory); *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986) (holding that there was no rational basis to give lesser-included-offense instruction where defense was that of innocence). Thus, the circuit court did not abuse its discretion in refusing Armstrong's proffered jury instructions in this case.

2020 Ark. 309, at 10, 607 S.W.3d at 498–99 (emphasis added).

In the case before us, Tyler's only defense was that he was not the person who shot Mr. Payne. In his opening statement, Tyler's counsel asserted, "It's our position that it wasn't Mr. Tyler. He wasn't on the scene when this happened." Likewise, in his motion for a directed verdict, Tyler's counsel argued that the State had not proved Tyler was present at the time of the murder. In closing argument, Tyler's counsel argued that the question for the jury to determine was "did this man do it." Tyler did not make any arguments—to either the court or the jury—regarding mens rea, justification, recklessness, or any other defense to justify his having shot Mr. Payne at close range, nor would the evidence have supported such

13

a position.  Under these circumstances the circuit court did not err in refusing to instruct the jury on second-degree murder and manslaughter.

Affirmed.

BARRETT and MURPHY, JJ., agree.

*Sharon Kiel*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Pamela Rumpz*, Ass't Att'y Gen., for appellee.